# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| SCOTT BENDER, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>DOMINO'S PIZZA, INC., RUSSELL J. WEINER, and SANDEEP REDDY,<br><br>                    Defendants. | Case No.<br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff Scott Bender ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Domino's Pizza, Inc. ("Domino's" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional

evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Domino's securities between December 7, 2023 and July 17, 2024, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Domino's, through its subsidiaries, operates as a global pizza company in three segments: U.S. Stores, International Franchise, and Supply Chain. Domino's offers pizzas and other food products under the Domino's brand name through Company-owned and franchised stores.  The Company's largest "master franchisee"—*i.e.*, a franchisee that is charged with developing a geographical area and may profit by sub-franchising and selling food and equipment to those sub-franchisees—is Domino's Pizza Enterprises ("DPE").  As of December 31, 2023, DPE operated 3,840 stores in 12 international markets, accounting for approximately 28% of the Company's international store count and 19% of its global store count.

3.     In December 2023, Domino's hosted its 2023 Investor Day, during which Defendants provided new long-term guidance of "1,100+" annual global net store growth for the years 2024 to 2028.

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) DPE, the Company's largest master franchisee, was experiencing significant challenges with respect to both new store openings and closures of existing stores; (ii) as a result, Domino's was unlikely to meet its own previously issued long-term guidance for annual global net store growth; (iii) accordingly, Domino's business and/or financial prospects were overstated; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.     On July 18, 2024, Domino's issued a press release announcing its Q2 2024 financial results.  Among other items, Domino's disclosed that it "expects it will fall 175 to 275 stores below its 2024 goal of 925+ net stores in international primarily as a result of challenges in both openings and closures being faced by Domino's Pizza Enterprises ('DPE'), one of its master franchisees."  Accordingly, "[t]he Company is temporarily suspending its guidance metric of 1,100+ global net stores until the full effect of DPE's store opens and closures on international net

store growth are known." On an earnings call held that same day to discuss the Company's Q2 2024 results (the "Q2 2024 Earnings Call"), the Company's Chief Financial Officer ("CFO") Defendant Sandeep Reddy ("Reddy") further revealed that the long-term guidance announced at the 2023 Investor Day did not accurately reflect the extent of DPE's challenges with respect to new store openings and closures of existing stores.

6.     On this news, Domino's stock price fell $64.23 per share, or 13.57%, to close at $409.04 per share on July 18, 2024.

7.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

8.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

10.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Domino's is headquartered in this

District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

11.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

12.     Plaintiff, as set forth in the attached Certification, acquired Domino's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13.     Defendant Domino's is a Delaware corporation with principal executive offices located at 30 Frank Lloyd Wright Drive, Ann Arbor, Michigan 48105.  The Company's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "DPZ."

14.     Defendant Russell J. Weiner ("Weiner") has served as Domino's Chief Executive Officer at all relevant times.

15.     Defendant Reddy has served as Domino's CFO at all relevant times.

16.     Defendants Weiner and Reddy are collectively referred to herein as the "Individual Defendants."

17.    The Individual Defendants possessed the power and authority to control the contents of Domino's SEC filings, press releases, and other market communications.   The Individual Defendants were provided with copies of Domino's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Domino's, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.   The Individual Defendants are liable for the false statements and omissions pleaded herein.

18.    Domino's and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

19.    Domino's, through its subsidiaries, operates as a global pizza company in three segments: U.S. Stores, International Franchise, and Supply Chain. Domino's offers pizzas and other food products under the Domino's brand name through Company-owned and franchised stores.  The Company's largest "master

franchisee" is DPE which, as of December 31, 2023, operated 3,840 stores in 12 international markets, accounting for approximately 28% of the Company's international store count and 19% of its global store count.

**Materially False and Misleading Statements Issued During the Class Period**

20.     The Class Period begins on December 7, 2023, when Domino's hosted its 2023 Investor Day.  During that event, in a presentation slide, Defendants provided new long-term guidance of "***1,100+***" annual global net store growth for the years 2024 to 2028.[1]

21.     On February 26, 2024, Domino's issued a press release announcing the Company's Q4 and fiscal 2023 financial results.  The press release stated, in relevant part:

> "Our strong fourth quarter demonstrates that our Hungry for MORE strategy is already delivering results. This strategy, which we recently unveiled at our Investor Day, is our plan to deliver MORE sales, MORE stores and MORE profits," said [Defendant] Weiner[.] "Domino's foundation has never been stronger. Our positive U.S. transactions and same store sales growth in both our delivery and carryout channels in the fourth quarter underscore the strength and momentum in our business. These results give us confidence in our brand and the Company's ability to win and create meaningful value for our shareholders."

> ***

**Long-Term Guidance (2024 – 2028)**

---

[1] All emphases included herein are added unless otherwise indicated.

The Company hosted its Investor Day on December 7, 2023, and announced the following long-term guidance metrics that the Company continues to expect to achieve. Annual global retail sales growth and annual income from operations growth exclude the impact of foreign currency.

- 7%+ Annual global retail sales growth;
- ***1,100+ Annual global net store growth***;
- 8%+ Annual income from operations growth.

22.     That same day, Domino's filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the year ended December 31, 2023 (the "2023 10-K").  In discussing the Company's business segments, the 2023 10-K stated, in relevant part:

### U.S. Franchise Profile

As of December 31, 2023, our network of 6,566 U.S. franchise stores was owned and operated by 735 independent U.S. franchisees. Our franchise formula enables franchisees to benefit from our brand recognition with a relatively low initial capital investment. As of December 31, 2023, the average U.S. franchisee owned and operated approximately nine stores and had been in our franchise system for over 17 years. Additionally, 22 of our U.S. franchisees operated more than 50 stores (including our largest U.S. franchisee who operated 143 stores) and 209 of our U.S. franchisees each operated one store as of December 31, 2023.

We apply rigorous standards to prospective U.S. franchisees. We generally require them to manage a store for at least one year and graduate from our franchise management school program before being granted the right to franchise. This enables us to observe the operational and financial performance of a potential franchisee prior to entering into a long-term agreement. Substantially all of our independent U.S. franchise owners started their careers with us as delivery drivers or in other in-store positions, which we believe offers advantages in terms of familiarity with our business and store operations. In addition, we

8

generally restrict the ability of U.S. franchisees to be involved in other businesses, which we believe helps focus our franchisees' attention on operating their stores. ***We believe these characteristics and standards are largely unique within the franchise industry and have resulted in qualified and focused franchisees operating Domino's stores.*** We maintain a productive relationship with our independent franchise owners through regional franchise teams, distributing materials that help franchise stores comply with our standards and using franchise advisory groups that facilitate communications between us and our franchisees. We consider our relationship with our U.S. franchisees to be good.

23.     Finally, in discussing the Company's purported strengths, the 2023 10-K stated, in relevant part:

**Strong and Proven Business Model**

Our business model generates U.S. and international franchise royalties and fees, supply chain revenues and retail sales at Company-owned stores. We have developed this model over our many years of operation, and it is anchored by strong store-level economics, which provide an entrepreneurial incentive for our franchisees and historically has generated strong demand for new stores. Over the past ten years, average U.S. store profitability in the Domino's system has increased meaningfully, resulting in higher profitability for our franchise owners. ***Our franchise system, in turn, has produced strong and consistent earnings for us through royalty and fee payments and through supply chain gross margins***.

We developed a cost-efficient store model, characterized by a delivery and carryout-oriented store design, with moderate capital requirements and a menu of quality, value-oriented and affordable items. At the store level, we believe the simplicity and efficiency of our operations give us significant advantages over our competitors, who, in many cases, also focus on dine-in or have broader menu offerings. At the supply chain level, we believe we provide quality, good value and consistency for our franchise customers while also driving profits for us, which we share with our franchisees under the profit-sharing arrangements described above.

9

***

> *We believe our store financial returns have led to a strong, well-diversified franchise system. This established franchise system has produced strong cash flows and earnings for us, enabling us to invest in the Domino's brand, stores, technology and supply chain centers, pay dividends, repurchase and retire shares of our common stock and service our debt obligations*.

24.     Appended to the 2023 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by the Individual Defendants, attesting that "the information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

25.     Also on February 26, 2024, Domino's hosted an earnings call with investors and analysts to discuss the Company's Q4 2023 results (the "Q4 2023 Earnings Call").   During the scripted portion of the Q4 2023 Earnings Call, Defendant Weiner stated, in relevant part:

> Our strong Q4 demonstrated that our Hungry for MORE strategy is already delivering results. Our positive U.S. same-store sales and transaction growth in both delivery and carryout underscore the strength and momentum that we're building in our business. These results and the initiatives that I'll cover today give me confidence in Domino's ability to continue to drive meaningful value for shareholders.

> We're excited to share an update on the business through the lens of our Hungry for MORE strategy. Now as a reminder, Hungry for MORE is our new strategy around what we're going to do to deliver over the course of the next five years, more sales, more stores and more profits.

***

We ended 2023 slightly ahead of our expectations on U.S. store growth and profits, adding 168 net new stores and finishing the year with estimated average franchisee profitability per store of $162,000. This highlights the momentum we expect to continue into 2024. I couldn't be more excited about 2024 and beyond for Domino's Pizza. Our foundation has never been stronger and our vision has never been greater. We made a ton of progress in 2023 and our strong start to '24 gives me confidence in our ability to win with customers and drive return for Domino's franchisees and shareholders.

26.     Also during the scripted portion of the Q4 2023 Earnings Call, Defendant Reddy stated, in relevant part:

*Now shifting to net stores, where we are expecting 1,100 or more, which will be driven by 175 in the U.S. and 925 in international. There was a meaningful uptick in our U.S. net store growth in the fourth quarter, which was slightly ahead of our expectations, and the pipeline continues to build*. We are expecting net unit growth in the U.S. to be relatively flat to 2023 in the first half of the year and to accelerate slightly in the back half based on current visibility.

27.     Further, during the Q&A portion of the Q4 2023 Earnings Call, when asked to discuss the Company's "confidence in [] accelerating on a global basis" and "what that looks like from a domestic and international standpoint," Defendant Weiner responded, in relevant part:

*We still feel really strongly about the guidance we gave, the 1,100 plus stores and 5,500 over the next five years. I mean you saw some really nice momentum at the end of the year in the U.S. in 2023*. We expect to see more at the end of the year in 2024. Internationally, I think we've got a lot of closures behind us, that was probably one of the things that was driving down the number this year. But those closures really focused on three areas. Domino's Pizza Enterprises, and they talked about their number, Russia and Brazil.

28.    On April 29, 2024, Domino's issued a press release announcing the Company's Q1 2024 financial results.  The press release stated, in relevant part:

"Our first quarter results demonstrated that our Hungry for MORE strategy is off to a strong start: delivering MORE sales, MORE stores, and MORE profits," said [Defendant] Weiner[.] "The Renowned Value we created through our new and improved Domino's Rewards loyalty program drove outsized comp performance, which flowed through to the bottom line with double-digit profit growth. Importantly, our growth in the U.S. came through positive order counts in both our carryout and delivery businesses for the second quarter in a row. Further, this order growth was across all income cohorts. In Q1 we also went live with marketing on Uber Eats, and we remain on track to exit the year at 3% or MORE of sales coming through this new channel. We are laser focused on driving franchisee profitability and store growth, which will fuel the Company's ability to win and create meaningful long-term value for our shareholders."

                                        ***

**Long-Term Guidance (2024 – 2028)**

The Company continues to expect to achieve the following long-term guidance metrics previously announced. Annual global retail sales growth and annual income from operations growth exclude the impact of foreign currency.

- 7%+ Annual global retail sales growth;

- ***1,100+ Annual global net store growth***; and

- 8%+ Annual income from operations growth.

29.    That same day, Domino's hosted an earnings call with investors and analysts to discuss the Company's Q1 2024 results (the "Q1 2024 Earnings Call").

During the scripted portion of the Q1 2024 Earnings Call, Defendant Weiner stated, in relevant part:

> Our Q1 results demonstrated that our Hungry for MORE strategy is delivering on its promise, driving more sales, more stores and more profit. We drove strong comp performance in the U.S. that flowed through to the bottom-line with double-digit profit growth. And our growth in the U.S. came through positive order counts across all income cohorts in both our carryout and delivery segments. We saw the largest growth in our lower-income cohorts that are undoubtedly benefiting from the renowned value that we're offering.
>
> ***
>
> Everything we do at Domino's is enhanced by our best-in-class franchisees, the E in our Hungry for MORE strategy. We'll be hosting thousands of franchisees for our worldwide rally in May, where we plan to bring our Hungry for MORE strategy to life across our global system. I can't wait for that gathering as our franchisees are what makes Domino's so special. They were the inspiration behind Hungry for MORE.
>
> So to close, I couldn't be more excited about 2024 and beyond for Domino's Pizza. Our first quarter results clearly show that our strategy is resonating with customers. This gives me great confidence that, we can deliver against our short- and long-term Hungry for MORE goals and drive significant value creation for our shareholders.

30.     Also during the scripted portion of the Q1 2024 Earnings Call, with respect to net stores, Defendant Reddy stated, in relevant part, that the Company "continue[d] to expect 1,100 or more, which will be driven by 175 in the U.S. and 925 in international" and that Domino's "continue[d] to expect an 8% or more year-over-year increase in operating income, excluding the impact of foreign currency."

31.    The statements referenced in ¶¶ 20-30 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) DPE, the Company's largest master franchisee, was experiencing significant challenges with respect to both new store openings and closures of existing stores; (ii) as a result, Domino's was unlikely to meet its own previously issued long-term guidance for annual global net store growth; (iii) accordingly, Domino's business and/or financial prospects were overstated; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

32.    In addition, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Domino's to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants' failure to disclose that DPE was experiencing significant challenges with respect to both new store openings and closures of existing stores violated Item 303 because this issue represented a known trend or uncertainty that was likely to have a material unfavorable impact on the Company's business and financial results.

## **The Truth Emerges**

33.    On July 18, 2024, Domino's issued a press release announcing the

Company's Q2 2024 financial results.  The press release stated, in relevant part:

**Long-Term Guidance (2024 - 2028)**

The Company continues to expect the following guidance metrics.
Annual global retail sales growth and annual income from operations
growth exclude the impact of foreign currency.

- 7%+ Annual global retail sales growth; and
- 8%+ Annual income from operations growth.

The Company now expects the following on annual global net store
growth:

- Global net store growth of 825 to 925 in 2024.
  - U.S.: The Company continues to expect 175+ net stores
    annually for 2024 to 2028.
  - ***International: The Company expects it will fall 175 to
    275 stores below its 2024 goal of 925+ net stores in
    international primarily as a result of challenges in both
    openings and closures being faced by Domino's Pizza
    Enterprises ("DPE"), one of its master franchisees. The
    Company is partnering closely with DPE as they work
    through this process and will provide further updates
    once it has more visibility into the effect on its annual
    global net store growth numbers.***
- ***The Company is temporarily suspending its guidance metric of
  1,100+ global net stores until the full effect of DPE's store
  opens and closures on international net store growth are
  known.***

34.     That same day, during the Q&A portion of the Q2 2024 Earnings Call, when asked to discuss the dynamic of the Company's disappointing new store guidance, Defendant Reddy responded, in relevant part:

> And so I think when you go back to the Investor Day back in December, I think one of the process that we went through was working with all of our master franchisees, including DPE, on the expectations that they had for the business. And we basically calibrated to that for both 2024 and the five-year horizon as well. And at that time, we were completely aligned. So then actually we got into the end of the Q1 call and then we got into the second quarter and we started seeing that relative to our expectations and cadence, both new store openings as well as closures, really started increasing from DPE.
>
> And as we saw that, we continued to engage with the DPE team to validate the forecast that we had for the year. And it became pretty clear as we actually went through that conversation and discussion that there was not only the risk to the second quarter that we were seeing, but clearly the outlook was going to be impacted as well. And in fact, just yesterday I think DPE put out a release with a number of closures that they outlined in the Japan and France market in particular, which they're targeting for their first half, which is our second half, which therefore will land in this fiscal year. So apart from what we've seen in second quarter, we expect to see more pressure in the second half of this year.

35.     Market analysts were quick react to Domino's announcements.  On July 18, 2024, *Reuters* published an article entitled "Domino's Pizza warns of slower Q3 sales; shares fall".  The *Reuters* article quoted a Northcoast Research analyst as stating that "[t]he market is anxious about risk going forward that this type of headwind will spread to more markets beyond Japan and France[.]"  That same day, *Bloomberg News* published an article entitled "Domino's Falls Most Since 2012

After Pulling Store-Growth Target." The *Bloomberg News* article quoted a Citigroup Inc. analyst as stating that "[t]his unexpected update will shake investor confidence in the company's broader guidance and put pressure" on the stock.

36. On this news, Domino's stock price fell $64.23 per share, or 13.57%, to close at $409.04 per share on July 18, 2024.

37. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

38. During the Class Period, Defendants had both the motive and opportunity to commit fraud. They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

39. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Domino's securities during the Class Period (the

"Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

40. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Domino's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Domino's or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

42. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and

securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

43.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Domino's;

- whether the Individual Defendants caused Domino's to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Domino's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

44.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

45. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Domino's securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Domino's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

46. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

47. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as

Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

48.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

49.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

50.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Domino's securities; and (iii) cause Plaintiff and other

members of the Class to purchase or otherwise acquire Domino's securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

51.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Domino's securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Domino's finances and business prospects.

52.    By virtue of their positions at Domino's, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each

Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

53.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Domino's, the Individual Defendants had knowledge of the details of Domino's internal affairs.

54.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Domino's.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Domino's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Domino's securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Domino's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Domino's securities at artificially inflated prices and relied upon the price of the securities, the integrity of

the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

55. During the Class Period, Domino's securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Domino's securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Domino's securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Domino's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

56. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with

their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

58.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

59.     During the Class Period, the Individual Defendants participated in the operation and management of Domino's, and conducted and participated, directly and indirectly, in the conduct of Domino's business affairs.  Because of their senior positions, they knew the adverse non-public information about Domino's misstatement of income and expenses and false financial statements.

60.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Domino's financial condition and results of operations, and to correct promptly any public statements issued by Domino's which had become materially false or misleading.

61.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Domino's disseminated in the

marketplace during the Class Period concerning Domino's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Domino's to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Domino's within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Domino's securities.

62.    Each of the Individual Defendants, therefore, acted as a controlling person of Domino's. By reason of their senior management positions and/or being directors of Domino's, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Domino's to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Domino's and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

63.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Domino's.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: September 20, 2024                     Respectfully submitted,

                                              POMERANTZ LLP

                                              */s/ Jeremy A. Lieberman*
                                              Jeremy A. Lieberman
                                              J. Alexander Hood II
                                              600 Third Avenue, 20th Floor
                                              New York, New York 10016
                                              Telephone: (212) 661-1100
                                              Facsimile: (917) 463-1044
                                              jalieberman@pomlaw.com
                                              ahood@pomlaw.com

                                              BRONSTEIN, GEWIRTZ &
                                              GROSSMAN, LLC

Peretz Bronstein
(*pro hac vice* application
forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiff*