**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

STATE of RHODE ISLAND OFFICE of the GENERAL TREASURER, on behalf of the EMPLOYEES' RETIREMENT SYSTEM of the STATE of RHODE ISLAND, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

DOMINO'S PIZZA, INC., RUSSELL J. WEINER, SANDEEP REDDY, JOSEPH H. JORDAN, and ARTHUR P. D'ELIA

Defendants.

Civ. No.: 2:24-cv-12477-LVP-APP

**AMENDED CLASS ACTION COMPLAINT**

Hon. Linda V. Parker

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS


I. INTRODUCTION .... 1
II. JURISDICTION AND VENUE .... 10
III. PARTIES .... 10
IV. SUBSTANTIVE ALLEGATIONS .... 13
- A. The Company's Business Model .... 13
- B. The Company's International Business .... 15
- C. Domino's Pizza Enterprises .... 20
- D. Domino's Experienced Substantial Difficulties Prior to the Class Period .... 22
- E. Defendants Misrepresented Domino's Ability to Grow International Stores .... 31
- F. Domino's Doubled Down at Investor Day, Ignoring Problems at DPE .... 39
- G. Confidential Witnesses Describe DPE's Problems During the Class Period .... 52
- H. Domino's Finally Admits That DPE's Problems Impacted the Company's Store Growth .... 56
- I. Domino's Was in Close Communication With DPE and Knew DPE's Current Condition At All Relevant Times .... 58
- J. The Individual Defendants Profited from their Fraud .... 64

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD .... 69
VI. THE TRUTH EMERGES .... 88
VII. ADDITIONAL SCIENTER ALLEGATIONS .... 93
VIII. NO SAFE HARBOR .... 96
IX. CLASS ACTION ALLEGATIONS .... 97
X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS .... 100
XI. CAUSES OF ACTION .... 101
COUNT I .... 101
COUNT II .... 104
XII. PRAYER FOR RELIEF .... 105
XIII. DEMAND FOR TRIAL BY JURY .... 106

Lead Plaintiff the State of Rhode Island Office of the General Treasurer, on behalf of the Employees' Retirement System of the State of Rhode Island ("Rhode Island" or "Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Domino's Pizza, Inc. ("Domino's" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.[1]

## I. <u>INTRODUCTION</u>

1. Plaintiff brings this federal securities class action on behalf of all persons and entities other than Defendants that purchased or otherwise acquired Domino's securities between December 7, 2023 and July 17, 2024, both dates

[1] Emphases are added to quotations herein, unless noted otherwise below.

inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), against the Company and certain of its top officials.

2. During the Class Period, Defendants falsely promoted the Company's net store growth guidance and the state of its international business segment even though those representations were not supported by the actual performance of that business unit at the time. Defendants Weiner and Jordan earned over $11 million in personal profits by selling their Domino's shares at prices that were artificially inflated by those misrepresentations before the Company's stock price fell when the truth was revealed.

3. Domino's describes itself as "the largest pizza company in the world with more than 20,500 locations in over 90 markets around the world." In international markets, Domino's grants geographical rights to "master franchisees" that are responsible for developing their designated geographic area. Domino's Pizza Enterprises Limited ("DPE") is the Company's largest master franchisee, with 3,840 stores in 12 international markets, accounting for approximately 28% of the Company's international store count and 19% of its global store count, as of the end of 2023.

4. In December 2023, Domino's hosted its 2023 Investor Day ("Investor Day"), during which Defendants provided new long-term guidance of "1,100+" annual global net store growth (*i.e.*, the net number of stores added after subtracting store closures) for the years 2024 through 2028. This guidance that Domino's gave at its Investor Day was especially important to investors because Domino's was just starting to emerge from a multi-year slump, from the end of 2021 through 2023, during which it lost approximately half of its value and completely overhauled its senior management team to lead its attempted turnaround. Before that time, Domino's was one of the best performing companies on the stock market for years and Defendants sought to return to its past success.

5. When Domino's hit bottom at the beginning of 2023, it was cautious about its guidance, but told investors that it "looks forward to providing more details at an Investor Day that will be held before the end of calendar 2023." Market analysts therefore highly anticipated the news that Domino's would announce at that time. When Investor Day finally came, analysts viewed very positively the 1,100+ global net store growth guidance that Domino's described as the ***minimum*** level of growth it would achieve. For example, reacting to the Company's "Hungry for MORE" campaign focused on growth over the next five years that it announced at Investor Day, Wells Fargo wrote a report titled "Investors Had High Hopes and Analyst Day Delivers 'More,'" UBS wrote a report titled "More Growth, More Upside," and

Deutsche Bank wrote a report titled "MORE Visibility on Longer-Term Outlook." All three cited the Company's "unit growth" guidance as supporting their positive assessments.

6. But Domino's faced a problem when it issued its global net unit growth guidance at Investor Day. DPE was struggling at the time and was in the midst of a comprehensive restructuring that included its closing a significant number of stores in 2023. Domino's repeatedly reassured investors that these problems at DPE would not detract from the net store growth guidance that Domino's gave at Investor Day. Even when analysts asked specifically about this issue, Defendants reassured investors that Domino's was confident about the Company's net store growth guidance because DPE's difficulties in 2023 were "idiosyncratic," "one-time," and "transitory" events that were in the past and therefore would not detract from the Company's guidance for 2024.

7. The news from DPE, however, painted a very different picture. On November 1, 2023, just before Investor Day, DPE explained that it was in the middle of a significant "RESTRUCTURING & STREAMLINING." DPE specifically described these difficulties as applying to its stores in Japan and France, among the ongoing challenges to its business as a whole. Defendants' descriptions of DPE's store closures in 2023 as one-time events that would not recur in 2024 was thus belied by DPE's contemporaneous descriptions of its own business.

8. DPE's problems then became even worse when, on January 24, 2024, it took the drastic measure of withdrawing any previous guidance for its fiscal year 2024 because of poor performance in Japan and France that was "weighing on the broader business." DPE thus advised that "***any previous guidance for FY24 performance, de facto or otherwise, is no longer in effect***." Yet, even with these clear warnings from DPE that it would not meet its own guidance, Defendants continued throughout the Class Period to misleadingly reaffirm Domino's annual net store growth guidance and to misrepresent the current state of DPE's business.

9. Investors had no way of knowing that Domino's annual net store growth guidance was not supported by DPE's actual performance during the Class Period, because Defendants repeatedly reaffirmed the Company's guidance despite DPE's problems. Defendants even promoted that guidance—and specifically rejected concerns that DPE's performance might detract from it—in response to questions from market analysts. For example, on February 26, 2024, when discussing the Company's results for 2023, Defendant Weiner responded to an analyst's concerns about global unit growth in light of the performance of the international segment by affirming that "[w]e still feel really strongly about the guidance we gave, the 1,100-plus stores and 5,500 over the next five years" and "[i]nternationally, I think we've got a lot of closures behind us," including DPE specifically. Weiner also emphasized, in response to a question regarding a

slowdown in performance in Europe, that "[o]ur European business is really strong, and we believe some of the pressures we're seeing there are generally transitory in nature. . . . We're partnering closely with [DPE] right now on those challenges." Similarly, Defendant Reddy assured on this call that Domino's was "very confident in where we are with store openings international. And we've been talking to our master franchisees and have good visibility to our expectations there."

10. In addition, Domino's did not break out its net store growth guidance by region. Investors therefore had no way of knowing how DPE's performance impacted the Company's overall guidance. Investors trusted Defendants when they continued to reaffirm the Company's net store growth guidance and the current state of its international segment—including DPE—during the Class Period.

11. Defendants were part of the Company's leadership team that was installed in 2022 as part of a wholesale management shakeup designed to turn around the recent slump that cut the value of Domino's in half. The market's view of Domino's, and its share price, finally started to improve in 2023 and continued to rise through the middle of 2024. Defendants promoted the Company's net store growth guidance during the Class Period even though those figures were not supported by DPE's performance at the time because they did not want to hinder the Company's long-awaited recovery. This enabled Defendants Weiner and Jordan to reap over $11 million in profits from selling a substantial portion of their Domino's

shares during a very short timeframe, while the Company's share price was artificially inflated, in uncharacteristically large sales as compared to their trading history.

12. The truth was finally revealed on July 18, 2024, when Domino's disclosed that it "expects it will fall 175 to 275 stores below its 2024 goal of 925+ net stores in international primarily as a result of challenges in both openings and closures being faced by Domino's Pizza Enterprises," largely in Japan and France. Domino's therefore was "temporarily suspending its guidance metric of 1,100+ global net stores until the full effect of DPE's store opens and closures on international net store growth are known." On this news, Domino's stock price fell $64.23 per share, or 13.57%, to close at $409.04 per share on July 18, 2024. Investors lost at least hundreds of millions of dollars as a result of this news. Attached as Exhibit A hereto is a chart showing the key events leading up to this disclosure.

13. Domino's did not meet its net store growth guidance as a result of the very same problems that plagued DPE since the start of the Class Period. Immediately before the Class Period started, DPE described its significant "restructuring," including in Japan and France, and on January 24, 2024—early in the Class Period—DPE withdrew its guidance because of poor performance in Japan and France, including because the business "overexpanded during COVID in Japan." *See infra* ¶¶ 85-87, 105. Confidential witnesses also described DPE's stores as

unable to profit because of its firmly rooted discounting practices from before the Class Period. *See infra* ¶¶ 119-28. Then, after the Class Period, DPE admitted that its store closures during the Class Period resulted from its growing too fast during the COVID pandemic and discounting too much—the very same issues that plagued DPE from before the Class Period. *See infra* ¶¶ 129-30.

14. Defendants knew of these problems all along because they admitted that Domino's was in regular communication with DPE about the state of its business and based the Company's guidance on internal information from DPE. This is also the most plausible explanation of events because DPE was the Company's largest and most important master franchisee.

15. For example, on February 26, 2024 Defendant Weiner discussed challenges that DPE faced, "especially [in] France," and stated "***[w]e're partnering closely with them right now on those challenges***"; Defendant Reddy stated that same day that Domino's was "very confident in where we are with store openings international" because "***we've been talking to our master franchisees and have good visibility to our expectations there***"; at the Investor Day Defendant D'Elia described how Domino's worked closely with its master franchisees and "***routinely conduct[s] a number of analyses to help us estimate the full store potential of our international business***." Moreover, on July 18, 2024, Defendant Reddy finally admitted "***what went on in the background***" leading up to the Company's Investor

Day guidance, including that ***Domino's "work[ed] with all of our master franchisees, including DPE, on the expectations that they had for the business***. And we basically calibrated to that for both 2024 and the five-year horizon as well."

16. In addition, confidential witnesses from DPE explained that DPE's business model was not sustainable because its franchisees were not able to make money, DPE's senior management knew the true state of DPE's business during this time, and its longtime CEO was fired as a result of these problems. Defendants knew the full extent of DPE's challenges based on the close communications between Domino's and DPE.

17. Defendants Weiner and Jordan profited enormously off of their misrepresentations. They made over $11 million in net profit by selling tens of thousands of shares of Domino's stock at inflated prices during a conspicuously short timeframe, before Domino's revealed on July 18, 2024, the true impact that DPE's problems had on the Company's net store growth guidance. These large, profitable stock sales were suspicious by every measure, including as compared to Weiner and Jordan's trading history, the large portion of their holdings that they sold, and their selling these shares for higher prices than the price of Domino's stock after the truth was revealed.

18. Weiner and Jordan knew that the facts on the ground at DPE did not support the net store growth guidance that Domino's gave at Investor Day. They

vigorously promoted those figures anyway throughout the Class Period so that they could earn millions of dollars in profits by selling their Domino's shares at artificially inflated prices before the truth was revealed.

## II. JURISDICTION AND VENUE

19. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

21. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Domino's is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

22. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

23. Plaintiff Rhode Island, as set forth in its previously filed Certification (ECF No. 9-4), acquired Domino's securities at artificially inflated prices during the

Class Period and was damaged upon the revelation of the alleged corrective disclosures.

24. Defendant Domino's Pizza, Inc. is a Delaware corporation with principal executive offices located at 30 Frank Lloyd Wright Drive, Ann Arbor, Michigan 48105. The Company's common stock traded in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "DPZ" during the Class Period.[2]

25. Defendant Russell J. Weiner ("Weiner") has served as Domino's Chief Executive Officer ("CEO") since May 2022. Prior to that, Weiner served as Domino's Chief Operating Officer ("COO") and President – Domino's U.S. from July 2020 to April 2022, and as Domino's COO and President of the Americas from July 2018 to June 2020. Prior to becoming COO, Weiner served as President of Domino's USA from October 2014 to July 2018, after joining the Company as its Executive Vice President - Chief Marketing Officer in 2008.

26. Defendant Sandeep Reddy ("Reddy") has served as Domino's Chief Financial Officer ("CFO") since joining the Company in April 2022. Prior to joining Domino's, Reddy served as CFO of Six Flags Entertainment Corp. beginning in July 2020.

---

[2] On January 1, 2025, the Company transferred its stock exchange listing, and its common stock now trades in an efficient market on Nasdaq Global Select Market ("NASDAQ") under the same ticker symbol "DPZ."

27. Defendant Joseph H. Jordan ("Jordan") has served as Domino's President - U.S. and Global Services since May 2022. Prior to that, Jordan served as Domino's Executive Vice President - International from April 2018 to April 2022, and as Domino's Senior Vice President and Chief Marketing Officer from May 2015 to April 2018. Jordan joined the Company as Vice President of Innovation in September 2011 and assumed responsibility for all field marketing activity in 2014.

28. Defendant Arthur P. D'Elia ("D'Elia") served as Domino's Executive VP, International from May 2022 until he resigned from the position in October 2024. Prior to that, D'Elia served as Domino's Executive Vice President, Chief Marketing Officer from July 2020 to April 2022, and as Domino's Chief Marketing Officer from February 2020 to July 2020. D'Elia joined the Company as its Senior Vice President, Chief Brand and Innovation Officer in January 2018.

29. Defendants Weiner, Reddy, Jordan, and D'Elia are collectively referred to herein as the "Individual Defendants."

30. The Individual Defendants possessed the power and authority to control the contents of Domino's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Domino's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Domino's,

and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

31. Domino's and the Individual Defendants are collectively referred to herein as "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. The Company's Business Model

32. Domino's is a pizza business that markets itself as selling "quality" food to its customers at "affordable" prices. Domino's describes itself in its 2023 Annual Report (the only Annual Report filed during the Class Period, on February 26, 2024) as "a highly recognized global brand" and "the largest pizza company in the world with more than 20,500 locations in over 90 markets around the world as of December 31, 2023." In addition to selling pizza, Domino's offers a variety of other food and beverage options to its customers.

33. Domino's "operates two distinct service models within its stores." Under the "delivery" model, customers can place their order either online or over the phone and Domino's delivers the order directly to them. Under the "carryout"

model, customers can place their order either online, over the phone, in-store or at a drive-thru window and pick up their order from the customer's preferred Domino's store location.

34. The Company explains that it is able to serve neighborhoods locally through its "large worldwide network of franchise owners and U.S. company-owned stores." Domino's describes itself as "primarily a franchisor." As of December 31, 2023, approximately 99% of the Company's global stores were owned and operated by independent franchisees.

35. Domino's promotes its franchising as "enabl[ing] an individual to be a business owner and maintain control over all employment-related matters and pricing decisions, while also benefiting from the strength of the Domino's global brand and operating system with limited capital investment by [Domino's]." The Company also touts its franchise model and believes it allows its customers to purchase Domino's menu items for themselves and their families "conveniently and economically."

36. Revenues and earnings are generated by Domino's by charging royalties and fees to its franchisees. Royalties consist of "ongoing percent-of-sales fees for use of the Domino's brand marks." Domino's also generates earnings and revenues by "selling food, equipment and supplies to franchisees through [its] supply chain operations . . . and by operating a number of Company-owned stores in the

United States." The franchisees profit by selling pizza and other complimentary items to their local customers.

37. In international markets, Domino's generally grants geographical rights to the Domino's Pizza brand to "master franchisees." These "master franchisees" are responsible for developing their designated geographical area and generate profit through sub-franchising and selling food and equipment to those sub-franchisees, as well as by running their own Domino's stores.

38. Domino's has "has three reportable segments: (i) U.S. stores; (ii) supply chain; and (iii) international franchise."

## B. <u>The Company's International Business</u>

39. The Company's international segment is comprised of a network of franchised stores in over 90 international markets. As of December 31, 2023, Domino's "had 13,737 international franchised stores. The principal sources of revenues from those operations are royalty payments generated by retail sales from franchised stores, as well as certain technology fees."

40. The "vast majority" of the Company's international markets are operated by "master franchisees." Master franchisees acquire franchise and distribution rights for entire regions or counties. Stores in eight of Domino's ten largest international markets are operated by master franchisee companies that are publicly traded on stock exchanges around the world. Domino's purports to select

its master franchisees based on several criteria, including their possession of local market knowledge, ability to identify and access targeted real estate sites, and access to sufficient capital to meet growth and development plans. Domino's states that it "consider[s] our relationship with our international franchisees to be good."

41. The international master franchise agreements that govern the relationship between Domino's and its master franchisees typically run for a ten-year period, with options for renewal. The agreements also "typically contain growth clauses requiring franchisees to open a minimum number of stores within a specified period." Through these master franchise agreements, master franchisees generally obtain the "exclusive rights to develop and sub-franchise stores, and the right to operate supply chain centers in particular geographic areas" and are charged with developing their particular geographic region. Master franchisees employ Domino's basic standard operating model and adapt it for the respective market they have exclusivity in to satisfy local eating habits and consumer preferences. For instance, Domino's offers unique pizza adaptations and accompaniments in several of its international markets to cater to the specific culture and consumer demand of the market.

42. In exchange for the exclusive rights provided for in the international master franchise agreements, the master franchisee is generally required to pay an initial, one-time franchise fee, and additional franchise fees anytime it opens a new

store. The master franchisees are also required to pay continuing royalty fees as a percentage of sales. These royalty fees, which vary among international markets and may also differ based on certain incentives and concessions applicable to a respective market, averaged approximately 3.0% in 2023. In certain cases, Domino's also has agreements with international master franchisees regarding "certain technology fees."

43. The following chart from the Company's 2023 Annual Report shows the breakdown of its stores and "Net Store Growth" since 2021:

| | U.S. Company-owned Stores | U.S. Franchise Stores | Total U.S. Stores | International Stores | Total |
|---|---|---|---|---|---|
| **Store count at January 3, 2021** | 363 | 5,992 | 6,355 | 11,289 | 17,644 |
| Openings | 13 | 201 | 214 | 1,094 | 1,308 |
| Closings | (1) | (8) | (9) | (95) | (104) |
| **Store count at January 2, 2022** | 375 | 6,185 | 6,560 | 12,288 | 18,848 |
| Openings | 5 | 136 | 141 | 1,135 | 1,276 |
| Closings | (3) | (12) | (15) | (229) | (244) |
| Transfers | (91) | 91 | — | — | — |
| **Store count at January 1, 2023** | 286 | 6,400 | 6,686 | 13,194 | 19,880 |
| Openings | 4 | 174 | 178 | 892 | 1,070 |
| Closings | (1) | (9) | (10) | (349) | (359) |
| Transfers | (1) | 1 | — | — | — |
| **Store count at December 31, 2023** | 288 | 6,566 | 6,854 | 13,737 | 20,591 |

44. Domino's explained that "Net store growth is a commonly used statistical measure in the quick-service restaurant industry that is important to understanding performance. Net store growth is calculated by netting gross store openings with gross store closures during the period. Transfers between Company-owned stores and franchised stores are excluded from the calculation of net store growth. Net store growth during fiscal 2023 reflects the closure of the remaining 159 net stores in the Russia market."

45. The Company's international market is particularly important to its business because its international store count was growing at a faster pace than its U.S. stores, with international stores comprising over two-thirds of the Company's stores by the beginning of 2023.

46. In addition, because Domino's international business is higher-margin, its international stores provide a disproportionate share of the Company's income as compared to the segment's revenue (shown in thousands of dollars):

| | U.S. Stores | Supply Chain | International Franchise | Intersegment Revenues | Other | Total |
|---|---|---|---|---|---|---|
| Revenues | | | | | | |
| 2023 | $ 1,454,272 | $ 2,829,224 | $ 310,077 | $ (114,215) | $ — | $ 4,479,358 |
| 2022 | 1,487,409 | 2,898,069 | 295,007 | (143,327) | — | 4,537,158 |
| 2021 | 1,498,360 | 2,699,863 | 298,036 | (138,886) | — | 4,357,373 |
| Segment Income | | | | | | |
| 2023 | $ 520,977 | $ 245,430 | $ 259,608 | N/A | $ (86,894) | $ 939,121 |
| 2022 | 438,604 | 208,799 | 236,144 | N/A | (26,022) | 857,525 |
| 2021 | 454,875 | 229,877 | 241,873 | N/A | (42,926) | 883,699 |
| Capital Expenditures | | | | | | |
| 2023 | $ 11,942 | $ 34,044 | $ 93 | N/A | $ 59,196 | $ 105,275 |
| 2022 | 9,830 | 34,625 | — | N/A | 44,384 | 88,839 |
| 2021 | 13,680 | 37,063 | — | N/A | 44,894 | 95,637 |

47. As Domino's explains, "[o]ur international franchise segment only requires a modest amount of general and administrative expenses to support its markets and does not have a cost of sales component. Therefore, the vast majority of these royalty revenues result in profits to us." Similarly, "[f]ranchise revenues do not have a cost of sales component, so changes in these revenues have a disproportionate effect on gross margin."

48. Indeed, the Company's income statement shows that its entire cost of sales, as well as its substantial U.S. franchise advertising, is attributable to sources of revenue separate from its international franchise royalties and fees (shown in

millions of dollars):

| | 2023 | | 2022 | | 2021 | |
|---|---|---|---|---|---|---|
| Revenues: | | | | | | |
| U.S. Company-owned stores | $ 376.2 | | $ 445.8 | | $ 479.0 | |
| U.S. franchise royalties and fees | 604.9 | | 556.3 | | 539.9 | |
| Supply chain | 2,715.0 | | 2,754.7 | | 2,561.0 | |
| International franchise royalties and fees | 310.1 | | 295.0 | | 298.0 | |
| U.S. franchise advertising | 473.2 | | 485.3 | | 479.5 | |
| Total revenues | 4,479.4 | 100.0% | 4,537.2 | 100.0% | 4,357.4 | 100.0% |
| Cost of sales: | | | | | | |
| U.S. Company-owned stores | 314.7 | | 378.0 | | 374.1 | |
| Supply chain | 2,437.3 | | 2,510.5 | | 2,295.0 | |
| Total cost of sales | 2,751.9 | 61.4% | 2,888.6 | 63.7% | 2,669.1 | 61.3% |
| Gross margin | 1,727.4 | 38.6% | 1,648.6 | 36.3% | 1,688.2 | 38.7% |
| General and administrative | 434.6 | 9.7% | 416.5 | 9.2% | 428.3 | 9.8% |
| U.S. franchise advertising | 473.2 | 10.6% | 485.3 | 10.7% | 479.5 | 11.0% |
| Refranchising loss (gain) | 0.1 | — | (21.2) | (0.5)% | — | — |
| Income from operations | 819.5 | 18.3% | 767.9 | 16.9% | 780.4 | 17.9% |
| Other income | 17.7 | 0.4% | — | 0.0% | 36.8 | 0.8% |
| Interest expense, net | (184.8) | (4.1)% | (195.1) | (4.3)% | (191.5) | (4.3)% |
| Income before provision for income taxes | 652.4 | 14.6% | 572.8 | 12.6% | 625.7 | 14.4% |
| Provision for income taxes | 133.3 | 3.0% | 120.6 | 2.6% | 115.2 | 2.7% |
| Net income | $ 519.1 | 11.6% | $ 452.3 | 10.0% | $ 510.5 | 11.7% |

49. Domino's also viewed its international market as a more significant source of future growth than the U.S. market. The Company explained in its 2023 Annual Report that "[i]n contrast to the U.S., international pizza delivery is relatively underdeveloped, with only Domino's and two other competitors having a significant global presence. We believe that demand for pizza delivery and pizza carryout is large and growing throughout the world, driven by international consumers' increasing emphasis on convenience, and is supported by our proven success of 40 years of conducting business abroad." At the start of the Class Period, Domino's was therefore highly focused on growth in its international segment.

50. In contrast, in the U.S., the quick service restaurant ("QSR") pizza category was $41.3 billion in 2023, making it "the second-largest category, by sales, within the $349.9 billion U.S. QSR sector." Moreover, in 2023, Domino's was the

"dollar market share leader for delivery and carryout among pizza QSRs," with its delivery segment of $16.5 billion in 2023 accounting "for approximately 40% of total U.S. consumer spend at pizza QSRs" and the "four industry leaders, including Domino's, account[ing] for approximately 60% of U.S. pizza delivery." In addition, "[f]rom 2018 to 2023, the carryout segment grew from $16.9 billion to $20.2 billion," with the "four industry leaders, including Domino's, account[ing] for approximately 52% of the U.S. carryout segment."

### C. Domino's Pizza Enterprises

51. Domino's Pizza Enterprises Limited ("DPE") was established in 1983 and has been publicly traded on the Australian Securities Exchange under the ticker "DMP" since its initial public offering in 2005. As of the end of 2023, DPE operated 3,840 stores in 12 international markets, which accounted for approximately 28% of Domino's international store count and 19% of its global store count.

52. Domino's has noted that DPE is the Company's largest master franchisee since at least 2014, overseeing the largest set of the Company's international stores of any master franchisee. The Company also noted in its 2023 Annual Report that DPE was its largest franchisee globally, since the Company had only 6,566 U.S. franchise stores, run by 735 independent franchisees, as compared to DPE's 3,840 stores. In addition, during the Class Period, Domino's stated that it expected DPE to open more than twice as many stores as the Company's next largest

master franchisee, with DPE expected to have 7,100 stores opened by 2033 and the next-largest master franchisee expected to have only 3,000. *See infra* ¶ 171.

53. Three of Domino's ten largest international markets as of the 2023 Annual Report are controlled by DPE: Japan, Australia, and France:[3]

| Market | Number of stores |
|---|---|
| India (JUBLFOOD: NS) | 1,916 |
| United Kingdom (DOM: L) | 1,254 |
| Japan (DMP: ASX) | 1,015 |
| Mexico (ALSEA: MX) | 894 |
| China (1405: HK) | 771 |
| Australia (DMP: ASX) | 747 |
| Turkey (DPEU: L) | 689 |
| Canada | 605 |
| France (DMP: ASX) | 489 |
| South Korea | 480 |

54. The largest of DPE's international markets is Japan, where it operated 1,015 stores. Japan was Domino's third largest international market as of the 2023 Annual Report. The Australian market, where DPE is based, was the Company's sixth largest international market, with 747 stores. The Company's ninth largest international market, also owned by DPE, was France, where it operated 489 stores.

55. Domino's viewed the Japanese and French markets as two of the Company's largest sources of international store growth potential among its developed markets. This is demonstrated in the Company's 2022 ICR Conference presentation, where it described its "international store potential" and listed Japan as having 842 stores with the potential to grow to 2,000 stores, the largest among all of the Company's international developed markets. Domino's also listed France as

[3] These ten international markets accounted for approximately 64% of the Company's international stores as of the end of 2023

having 454 stores with the potential to grow to 1,000 stores, tied for the third highest store growth potential among international developed markets. Both markets were also referenced as top ten international markets in every Domino's Form 10-K filed since 2012 and were regularly discussed by Domino's executives on earnings calls.

### D. <u>Domino's Experienced Substantial Difficulties Prior to the Class Period</u>

56. From when Domino's went public on the U.S. stock market in 2004 through 2021, it was one of the best performing stocks on the market. As shown by the Company's stock chart, however, Domino's was not able to maintain its pace of growth and declined sharply from the end of 2021 through the beginning of 2023:




57. From December 31, 2021 through February 28, 2023, following when Domino's reported its financial results for 2022, the Company's share price dropped

from $564.33 per share to $294.01 per share, wiping out approximately 48% of the Company's value and approximately $10.2 billion in market capitalization[4]:




58. The Company's results for the fourth quarter and full year of 2022, which it reported before the market opened on February 23, 2023, were very disappointing. As the *Wall Street Journal* reported that day, "[s]hares of Domino's Pizza, one of the best-performing stocks in recent history, fell in early Thursday trading after the pizza-delivery company report cut its sales-growth outlook and turned in fourth-quarter revenue that missed the Street's expectations." This report noted that "[i]nvestors familiar with the stock will know this already: Domino's has offered some of the most dramatic stock returns of the century. The shares are up

---

[4] These are the closing prices of Domino's stock on these days.

about 2500% over the past 15 years, compared with roughly 170% for the Dow industrials." But the stock was down approximately 11% in early trading and 17% over the past year.

59. Similarly, *Barrons* reported that Domino's "tumbled nearly 12% on [February 23, 2023] after it delivered a lackluster fourth quarter, making it the worst-performing stock in the S&P 500." The stock then continued to fall the following day "after two analysts downgraded the stock, and many more lowered their financial forecasts and targets for the price." Analysts across Wall Street were "lowering their expectations" for Domino's based on these results. For example, Baird cut its rating on Domino's to Neutral from Outperform and cut its price target for the stock from $400 to $320. Similarly, Citigroup cut its rating "to Neutral from Buy, slashing [its] price target to $316 from $429." Domino's faced several problems, including customers returning to dine-in restaurants following the pandemic and how Domino's customers in particular—as compared to customers of other brands—"responded to higher prices" from inflation.

60. The Company's performance suffered in both its U.S. and international businesses. KeyBanc reported that "[b]oth Domestic and International segment [same store sales] trends fell short of consensus (and likely investor) expectations, and the Company revised its two- to three-year global retail sales growth and unit growth outlook by 1 point and 2 points, respectively, citing slowing delivery

demand." Morgan Stanley reported that "[n]umbers move lower on reduced unit growth, sales expectations, with US delivery the main driver but other cracks in the business today."

61. Wedbush explained that Domino's "lowered its previous 2-3 year outlook of 6%-10% annual global retail sales growth to 4%-8% and its previous annual global net unit growth outlook of 6%-8% to 5%-7%."

62. In its February 23, 2023 earnings release, Domino's lowered its guidance for both global net unit growth and global retail sales growth, as follows:[5]

| | Previous Two-to Three-Year Outlook | Updated Two-to Three-Year Outlook |
|---|---|---|
| Global retail sales growth, excluding foreign currency impact | 6% – 10% | 4% – 8% |
| Global net unit growth | 6% – 8% | 5% – 7% |

63. The Company's lowered estimate on February 23, 2023 of net store growth of 5% to 7% came out to growth of 994 to 1,392 stores, based on the total number of current stores that Domino's reported at the time, as of January 1, 2023. Domino's also stated in this release that it "looks forward to providing more details at an Investor Day that will be held before the end of calendar 2023." The Company's inability to provide more clarity on its lowered guidance beyond stating

[5] Domino's used the terms "global net unit growth" and "global net store growth" interchangeably throughout the Class Period to refer to the same metric. They are therefore referred to interchangeably in this Complaint. Domino's calculates these metrics by netting the amount of stores opened with the amount of stores closed during the time period at issue. This calculation excludes transfers between Company-owned stores and franchised stores.

that it would provide more detail at some point in the coming year made investors even more unsure of what to expect from Domino's going forward.

64. Analysts did not have confidence in even these lowered expectations at the beginning of 2023. For example, Baird had "lower conviction in the [company's] fundamental outlook"; Citigroup expected "at least another year of challenged top/bottom-line growth"; and Wedbush stated that "2023 is expected to be at the low end of each of these targets."

65. Net store growth is critical to the Company's success because it is one of just two ways that its business model provides for growing revenue, along with increasing same-store sales. Indeed, in its 2023 Annual Report, Domino's explained that its "financial results are driven largely by retail sales at our franchised and Company-owned stores" and that "[c]hanges in retail sales are primarily driven by same store sales growth and net store growth." Domino's also emphasizes that it follows both same stores sales growth and net store growth "very closely," recognizes that these two metrics "directly impact [its] revenues and profits," and "strive[s] to consistently increase both metrics."

66. Given how poorly Domino's performed in the fourth quarter of 2022, and over the prior two years more generally, the stock price was primed to increase upon even the slightest positive news. For example, given the stock's dramatic fall, Oppenheimer maintained an outperform rating, with a price target of $375, stating

that "[f]ollowing the stock's 12% post-earnings pullback, we will more intensely search for an actionable catalyst, as DPZ has become more intriguing at current levels." Similarly, Morgan Stanley maintained its overweight rating, while reducing its price target to $405 from $430, stating that "[w]e think there's an increased focus on addressing these, but with patience required, and investor focus on unit growth stability, delivery dynamics."

67. Over the course of 2023, Domino's then began to give investors hope that the Company had turned a corner and the Company's share price started to recover. That improvement continued through the Class Period, until Domino's revealed the truth on July 18, 2024:




68. For example, Barclays explained in a report dated July 24, 2023, discussing the Company's results for the second quarter of 2023, that "[l]ooking

back to 4Q22, Domino's lowered its 2-3 year outlook for WW [worldwide] retail sales growth and WW net unit growth guidance." Barclays explained further that "while 2023 is expected toward the low(er) end of the new ranges," with "WW net unit growth at the low end of the new 5-7% range[, i]mportantly, trends are expected to improve on both fronts as we close 2023 and continue momentum into 2024." Barclays therefore "remain[ed] cautious" about Domino's and "look[ed] forward to hearing more on the 'work in progress' turnaround at the Domino's Investor Day on 12/7/23." Overall, Barclays described the quarter as "uneventful" and stated that "confidence [was] high on accelerating comp and unit growth into '24." Barclays raised its price target for the stock from $270 per share to $320 per share.

69. Similarly, in a report dated July 24, 2023, Oppenheimer increased its price target for Domino's from $400 to $427 based on optimism that "the negative earnings revision cycle that has plagued [Domino's] is now in the rear-view mirror. . . . 2024 is setting up to be an exciting year for a re-acceleration in SSS and unit growth." Focusing specifically on store growth, Oppenheimer stated that "[i]nto 2024 mgmt anticipates a unit growth re-acceleration, particularly as Int'l closures potentially normalize and U.S. gross openings step up." The Company's upcoming "Investor Day on December 7th in Ann Arbor" was particularly important because it "could help elevate investors' visibility into a potentially strong 2024 earnings year." Oppenheimer's investment thesis was premised on the fact that the

Company's "recently adjusted . . . 2-3 year financial outlook to reflect ongoing challenges," including "unit growth of +5-7% (from +6-8%)," meant that "the bar is now intriguingly low." Two of the four main catalysts for the Company reaching Oppenheimer's expectations were the "Investor Day in December 2023" and "Mgmt's ability to address 2-3-year financial targets for system-sales growth of 4-8% and unit growth of 5-7%." Oppenheimer's "Base Case Assumption" (*i.e.*, its middle ground assumption that was neither its upside or downside scenario) included that "[u]nits grow 5-7% annually as franchisee profitability improves and payback periods remain attractive."

70. Given how far Domino's stock had fallen, and now that it was finally starting to recover based on expectations for the Company's performance in 2024, Defendants were highly incentivized to avoid disappointing investors yet again and causing the Company's stock price to return to its recent multi-year low prices. This was especially the case for the Company's new management team, with all of the Individual Defendants serving in their current senior roles only since 2022. *See supra* ¶¶ 25-28.

71. On March 1, 2022, Domino's announced that on February 24, 2022, its then-CEO, Richard E. Allison Jr. was retiring on April 30, 2022 and did not plan to stand for re-election on the Company's Board of Directors. On the same day, Domino's announced that Defendant Weiner would be appointed CEO on May 1,

2022 and Defendant Reddy would be appointed CFO on April 1, 2022 (replacing Stuart A. Levy whom Domino's announced on May 19, 2021, "resigned from his position with the Company effective May 19, 2021 to pursue opportunities outside of the Company"). Three days later, on March 4, 2022, Domino's announced that Defendant Jordan was being promoted to the role of President, U.S. & Global Services and Defendant D'Elia was being promoted to the role of Executive Vice President – International, effective May 1, 2022.

72. This wholesale management shakeup was made because of the Company's poor performance at the time. A March 1, 2022 article in *Restaurant Business Magazine*, a leading publication in the commercial foodservice industry, described the "leadership shakeup," with Allison departing after only four years as CEO, as "follow[ing] a year in which Domino's sales seemed to slow amid labor and other challenges," including "the previous quarter [when] the company ended a decade-long run of quarterly same-store sales growth." Similarly, the leading industry publication *Restaurant Dive* noted that Allison's retirement was "part of a broader executive shake up." The Individual Defendants thus faced heightened pressure to improve the Company's performance after its dramatic fall continued through the beginning of 2023.

73. Indeed, J.P. Morgan wrote in a note dated June 29, 2023, that it was "increasingly confident" in its recent upgrade of Domino's based on its "relatively

rare private meeting at Domino's Ann Arbor HQ" with "CEO Russell Weiner, CFO Sandeep Reddy and Ryan Goers VP Finance & IR." J.P. Morgan explained that the Company's former CEO (from 1999 to 2010) and current Executive Chairman, David Brandon, was not at the meeting, but "sounds to be acting in an advisor/coach position to Russell as this role is relatively new to him as of May 2022." "Overall," J.P. Morgan "came away optimistic with the Company's energy in re-growing US delivery transactions as enthusiasm across the system for 'reinventing the operations cycle' through a rebuilt leadership team of both external and internal talent." This included Defendants' "optimism for a re-acceleration in US growth in late F23 and continued confidence that the global system will grow units at 1,000+ a year."

### E. Defendants Misrepresented Domino's Ability to Grow International Stores

74. DPE, the Company's largest master franchisee, faced significant difficulties in 2023 that required it to close a substantial number of stores. Domino's falsely portrayed those difficulties as a thing of the past even though they continued into 2024. Despite these continued difficulties at DPE, Domino's inexplicably issued new unrealistic long-term global net store growth guidance at its long-awaited Investor Day on December 7, 2023.

75. DPE's problems centered on its poor performance in Japan and France—two of the Company's top ten international markets—that resulted in store closures in those markets, among difficulties across its entire business.

76. On June 12, 2023, DPE's CEO discussed store closures in Japan at an Investor Q&A.[6] During the Q&A, an analyst inquired about whether increasing new stores was cannibalizing DPE's own footprint in certain markets while pointing out that DPE was closing stores located near each other. DPE's CEO responded by explaining that there were three reasons for why store closures occurred in Japan, including that DPE had acquired stores too close to each other, rent restructuring, and that DPE had forecasted more "growth in that area than [DPE] achieved." DPE deemed the closure of underperforming stores in Japan as necessary to "[o]ptimi[ze] the corporate store network" growth, as described in a trading update and press release that DPE issued the next day.

77. Despite these closures and concerns surrounding DPE, on June 14, 2023, at the Oppenheimer Consumer Growth & E-Commerce Conference, Domino's CFO Defendant Reddy, downplayed international store closures as "idiosyncratic," touted gross openings as "very strong," maintained confidence that gross openings would continue to be strong, expressed optimism about the growth potential in France where the market was not as penetrated as expected, and touted each of the Company's top 20 markets as having "very compelling economics."

[6] When referencing materials from or about DPE from Australia, the date provided on those materials is referenced above, which may be a day earlier in the United States given the difference in time zones.

After this conference, the Company's stock price increased from a closing price of $305.72 on June 14, 2023, to a closing price of $325.46 on June 15, 2023.

78. Then, on the Company's July 24, 2023 Q2 2023 earnings call, Defendant Reddy continued to downplay DPE's struggles and to express optimism about the Company's full year run rate of net store growth in 2024. Reddy justified this optimism by claiming DPE's closures were of "underperforming stores in certain challenged markets" and that, for this reason, they are "not anticipated to materially impact the financial benefit of our new international store openings."

79. Analysts believed the Company's representations that DPE's store closures as of that time would not impact the Company going forward. For example, Barclays specifically noted in its July 24, 2023 report discussed above, in which it raised its price target for Domino's stock from $270 per share to $320 per share, that although the Company's Global Unit Growth was trending "toward the low end of 2-3 Year Outlook for 5-7%," Domino's was now "expect[ing] growth to inflect towards the end of the year and into 2024 once store closures are 'behind us.'' In addition, Domino's was "anticipat[ing] returning to full-year run rate of net store growth of +5-7%." As for International Unit Growth in particular, Barclays highlighted that while DPE, the Company's "publicly-traded master franchisee [was] likely [to] close 65-70 underperforming stores" in the third quarter of 2023, and Domino's would therefore "remain pressured by international store closures"

for the full year 2023, those international store closures "are 1x in nature." In other words, those closures were not expected to repeat in 2024. *See also supra* ¶¶ 68-69, 73.

80. This Barclays report was quoting Defendant Reddy's statement on the Company's earnings call that day stating that while DPE, "one of our publicly traded master franchisees recently disclosed their intention to close an additional 65 to 70 underperforming stores," which "will pull down our net store growth rate in the upcoming quarter and for the full year" 2023, Domino's "anticipate[s] returning to our full year run rate of net store growth in 2024 once these store closures are behind us."[7]

81. Similarly, at the Piper Sandler Growth Frontiers Conference on September 13, 2023, an analyst specifically asked Defendants Reddy and Jordan about international store opening and closures, asking:

> [O]n the international front, this year, some closures above average, but you've maintained that the gross openings are very strong and you feel positive about that looking forward. So just as we have you up here today, as we look forward next year, anything investors should be contemplating from, I guess, a closures perspective or a gross openings perspective versus I know we have a long-term guidance out there, so is it contained to specific markets is really what I'm trying to ask?

---

[7] For 2023, Reddy stated that Domino's "continue[s] to expect our 2023 global unit growth to track to the low end of our 5% to 7% two to three year outlook."

Defendant Reddy responded by downplaying the issue as being no different than the prior quarter, when Domino's represented that DPE was experiencing closures in 2023 but was now improving its performance, making Domino's "very confident" in its store-opening guidance:

> Yeah. I think the growth momentum on the international markets is very strong. We look at the gross openings. And honestly, I think, we talked about in the last earnings call, we said we're going to be pressured this year with some of the closures that we saw, I think, more particularly on Domino's Pizza Enterprises that is expected to have some closures. But I think the underlying health of the different markets in which we operate is very good. And I think that a leading indicator tends to be the same-store sales, the comps that we're seeing, we're up about 3% last quarter. I think Domino's Pizza Enterprises, which is where some of the closures are actually happening, we talked about the six-week trend. And that was also positive 3%, give or take. So, that's all very good, because from a profitability standpoint, this is really going to drive the momentum case going forward. So we're very confident.

82. Then, on October 12, 2023, Defendants repeated this message when Domino's held an earnings call in conjunction with its financial results for the third quarter of 2023. In its earnings release that day, Domino's announced that "[b]ased on actual results for the three fiscal quarters of 2023 and the Company's outlook for the remainder of fiscal 2023, the Company expects its 2023 global net store growth to trend at or slightly below the low-end of its 5% to 7% two- to three-year outlook." On the earnings call, Defendants reassured investors that this low-end guidance was limited to 2023, as a result of DPE's one-time closures. As part of his opening

remarks, Defendant Reddy said, "global retail sales grew 5.1% due to positive international sales comps and global net store growth." He added, "Despite strong gross openings, we will be pressured by elevated store closures this year that ***we believe are mostly behind us***. Since these closures were underperforming stores in certain underperforming markets, we do not anticipate this will materially impact the financial benefit of our new international store openings." Reddy also noted that "store closures from Domino's Pizza Enterprises" were already "mentioned on our last call."

83. When responding to an analyst question on this call concerning the basis for the Company's updated store growth outlook, Defendant Weiner said:

> Domino's Pizza Enterprises announced over the summer that they were going to have closures as part of a kind of a ***short-term business adjustment on their side***. And we saw those in Q2 and Q3. What Domino's Pizza Enterprises also did was they talked about that they were not going to change and they were still bullish around their long-term outlook for 2033 still at 7,100 stores. So I see this as kind of both of these as ***one-time-ish events***.[8]

84. While Domino's sought to portray DPE's problems as behind it, they actually continued into the Class Period. On November 1, 2023, DPE released its results for its fiscal 2023, making clear that its stores in Japan and France, as well as

[8] The other one-time event that Weiner referenced was closures based on the Company's exiting from Russia, which "obviously were talked to ahead of time." Stores in Russia did not affect Defendants' confidence in their guidance going forward because Domino's exited that business.

its business as a whole, continued to suffer from challenges. DPE's Annual General Meeting presentation by its CEO, Don Meij, highlighted that its fiscal year 2023 "was a challenging year for our franchisee partners and Domino's Pizza Enterprises Ltd." DPE's presentation by its Chairman, Jack Cowin, framed its current efforts as part of a "significant program" to "restructure our business."

85. In Meij's presentation, DPE "acknowledge[d]" that it had "some challenges still to address, largely to deliver sales growth in Japan and accelerate momentum in France." He added that Japan was in need of a "turnaround" and France, "although positive, is still yet to achieve the same momentum as other larger markets and we are applying a high level of focus to this market." With its rebuilding "initiatives underway," including "strategic cost reductions," DPE did not expect "to return to our store growth outlook" until "FY25." While DPE expressed vague optimism about its rebuilding efforts, it gave a very different timeline for its store growth than did Domino's.[9]

86. Moreover, DPE's November 1, 2023 presentation from its Chairman made clear that it was still in the midst of a "RESTRUCTURING & STREAMLINING" of its business as a whole, which was a "significant program"

---

[9] DPE self-servingly tried to put a positive spin on this delay, stating: "With the initiatives underway, from new product development to strategic cost reductions, franchisee partners will benefit from improved earnings, to return to our store growth outlook in FY25."

that was still underway and would deliver "[m]aterial, near-term cost savings." Another slide, titled "OUTLOOK," stated that "OUR BUSINESS AND OUR TEAM HAS FACED NEW CHALLENGES." In addition, when discussing DPE's "suite of business improvement initiatives designed to restructure our business" and to build a "new foundation for our future," CEO Meij noted that "France is taking slightly longer than anticipated."

87. DPE's Chairman also made clear that the restructuring of DPE's business was a "significant program" that was still "underway," designed to "deliver material, near-term cost savings" and "improve efficiency." One of the two parts of this program that he highlighted as "most significant" was "reducing the size of the corporate store network through closing underperforming stores and accelerating the refranchising of others."

88. Domino's knew about the problems at DPE as they occurred based on their close relationship—with DPE being the Company's largest master franchisee—and Defendants admitting that Domino's based the Company's representations on information from DPE and regularly discussed DPE's business with it (as would be expected). *See infra* ¶¶ 138-43. Investors, however, did not know how DPE's problems impacted Domino's because Domino's specifically misled investors about that issue by affirming the Company's guidance despite DPE's

challenges and giving investors the false impression that DPE's store closures were one-time events that would not continue in 2024.

89. Moreover, during the Class Period, Domino's concealed its internal guidance for DPE's store growth by discussing guidance for the Company as a whole and its international segment. When Domino's expressed confidence in its net store growth guidance, investors did not know how that metric broke down across the Company's various international markets and master franchisees.

### F. Domino's Doubled Down at Investor Day, Ignoring Problems at DPE

90. Despite the clear signal from DPE that it would not get its store growth trajectory back on track in 2024, Domino's plowed ahead with its guidance for its international store growth without accounting for DPE's continued difficulties. They refused to reverse course from their prior position that DPE's problems were one-time events that were limited to 2023. At the Domino's Investor Day on December 7, 2023, which analysts were eagerly awaiting for more detail on the Company's performance (*see supra* ¶¶ 68-69), Domino's launched its new "Hungry for MORE" strategy to "[d]rive [s]ignificant [g]rowth" over the next five years. This strategy repeatedly emphasized the Company's plans to add "MORE STORES" to its portfolio.

91. As part of this new strategy, Domino's inexplicably decided to issue new long-term global net store growth guidance that did not account for the

continued problems at DPE. This new guidance called for global net store growth of ***at least*** 1,100 stores annually. Defendant Weiner explained that "we're going to go away from a range to a number. 1100 around the world." He then emphasized that "again, 1100 is the floor. We're looking to deliver more." Weiner also made clear that Domino's would be able to meet this new guidance despite DPE's past store closures that Domino's discussed on its earnings call for the third quarter of 2023 because "those one[-]time things will get behind us." Since that was no longer an issue according to Weiner, "that's essentially why we gave a floor with more because if we think about guidance, we want you to understand where we're getting back to and that we're going to continue to grow."

92. Similarly, Defendant Reddy explained at the Investor Day that for international net store growth, "we expect again to do 925 plus stores in international. I think this year has been characterized by a number of idiosyncratic closures. Hopefully, most of that is the rear view mirror. And as we move forward next year, with all the initiatives that we're talking about, we should be back on track with the 925, at least in 2024, and then accelerate from there to do more beyond that."

93. Also at the Investor Day, Defendant D'Elia stated that Domino's is "really excited" about its expansion of its international store portfolio and Defendant Reddy touted the Company's international segment as "an unbelievable story." In

fact, D'Elia even specifically described France as having "tons of headroom" and a "big market potential[] for us," and Japan as also "hav[ing] big potential on that market."

94. This projected net store growth was crucial to the Company's revenue and income because, as Weiner explained at the Investor Day, as for "profit measure, we didn't guide on this before, but we want you to understand [that] we are determined to take this incremental sales volume and translate it into profit that outgrows our sales. 8% is the floor where our goal is to deliver more."

95. The Company's net store opening guidance unveiled at the Investor Day thus highlighted the Company's continued growth and specifically denied any problems in Japan and France by promoting those markets and describing their problems as in the past.

96. The new net store opening guidance that Domino's gave at the Investor Day (1,100+ stores per year) was similar in numbers to the prior guidance that the Company gave in February 2023 (994-to-1,392 stores per year (*see supra* ¶ 63)), but was more positive in several respects. ***First***, Weiner repeatedly emphasized that the new guidance was a "floor," but Domino's was "looking to deliver more," "Hungry for More," and "a floor with more because if we think about guidance, we want you to understand where we're getting back to and that we're going to continue to grow." ***Second***, whereas the prior guidance was just for two-to-three years, the new

guidance was for five years, through 2028. ***Third***, Weiner explained that Domino's was "going to go away from a range to a number," by shifting from previously giving a guidance range of 5% to 7% net store openings to now providing a floor of at least 1,100 net store openings, because "we are holding ourselves accountable for . . . the minimum" while "we are hungry to deliver more" and "everyone in this room and across the world that wears this logo, we're going to be doing our best to deliver more."[10] ***Fourth***, Domino's tied its store growth to operating income, which was a "profit measure" and the Company "didn't guide on this before."

97. ***Fifth***, analysts were previously skeptical of the prior net store opening guidance that Domino's gave in February 2023, noting that Domino's was coming in at the lower end of that range over the course of 2023, and therefore viewed the Investor Day as very important for obtaining more insight into the Company's plans. *See supra* ¶¶ 68-69. Indeed, Domino's itself issued its prior guidance much more tepidly, giving much less information when it lowered its guidance on February 23, 2023 and advising that it "looks forward to providing more details at an Investor Day that will be held before the end of calendar 2023." *See supra* ¶ 63. The Company continued this stance throughout the year, with Defendant Reddy stating at the

---

[10] Weiner described the nature of shifting from a range to a floor when discussing global retail sales guidance and then immediately, in the next sentence, went on to discuss net store opening guidance. He made clear that the nature of giving a floor rather than a range applied to the net store opening guidance by stating "[a]gain, we're going to go away from a range to a number."

September 13, 2023 Piper Sandler Growth Frontiers Conference that "what we really don't want to get into is guidance today for sure" and "we'll talk more about this during Investor Day. So you'll have more clarity about that." When the Investor Day finally came on December 7, 2023, Domino's issued its new net store opening guidance with much more confidence.

98. Analysts had an overwhelmingly positive reaction to the Investor Day guidance. In its December 7, 2023 report titled "Investors Had High Hopes and Analyst Day Delivers 'More,'" Wells Fargo said, "it's hard not to get excited about the prospects of accelerating comps/unit growth." Wells Fargo summarized the Investor Day by observing: "Analyst day was clearly a positive event. DPZ blessed the Q4 inflection (even w/o Uber), unit growth is accelerating & we see one of few QSRs capable of bucking the FY24 traffic turndown."

99. Similarly, in its December 8, 2023 report titled "More Growth, More Upside," UBS emphasized the Company's "attractive guidance that offers upside" and "strong unit returns & franchisee demand should enable improved unit growth." UBS noted that long term "growth targets are solid and offer upside from 'at least' levels" and "**Further upside exists w/ strengthening sss and unit growth**." UBS rated Domino's stock a Buy, with a $450 price target.

100. Furthermore, Deutsche Bank added in a report that same day that the Investor Day gave "MORE Visibility on Longer-Term Outlook" and raised its price

target from $430 per share to $455 per share. Deutsche Bank viewed very positively that "the company was clear and consistent that targets were a floor on which to build, with successful execution supporting upside" and therefore "remain bullish and believe DPZ offers a favorable setup into 2024, supported by a slate of initiatives to drive accelerating SSS and traffic, unit growth and operating profit growth." Deutsche Bank also noted that the guidance for international net unit growth "seems reasonable." In addition, Deutsche Banke specifically noted that Domino's "introduced a new long-term guidance framework, which establishes a floor on growth metrics (rather than a range), and provided additional financial targets beyond the typical metrics. DPZ is now guiding to retail sales growth of 7%+, annual net unit growth of 1,100+ (implies ~5% growth over next few years) and operating income growth of 8%+."

101. Investors reacted immediately to the positive guidance that Domino's provided at Investor Day. The Company's stock price closed at $402 per share on December 7, 2023, as compared to $392.54 the prior day, with trading 78% above the 20-day moving average.

102. Despite the optimism that Domino's projected on Investor Day, the ongoing downward trend of DPE's poor performance, particularly in Japan and France, continued after Domino's issued its new long-term guidance. On January 24, 2024, DPE provided a trading update, acknowledging that "negative H1 Same

Store Sales" in Japan and France was "weighing on the broader business." DPE thus took the drastic measure of withdrawing any previous guidance for its fiscal year 2024 performance and advising, "[w]ith improvements still required in H2 to grow order volumes, [DPE] ***advises any previous guidance for FY24 performance, de facto or otherwise, is no longer in effect***."[11]

103. In response to DPE's poor financial results, DPE's share price dropped approximately 31 percent, wiping out approximately $1.6 billion in market capitalization. Analysts covering DPE expressed particular concern over its performance in Japan and France. For example, Citigroup downgraded DPE's stock from buy to neutral because of increased uncertainty surrounding the Japan and France outlook, which together constituted 39% of DPE's stores. Citigroup's analyst added that "[t]he miss appears to be driven primarily by Japan where the company has greater leverage due to its relatively higher proportion of corporate stores."

104. Goldman Sachs also emphasized Japan's impact on DPE's performance, stating "[t]his profit downgrade supports our thesis that Japan's elevated competition post-COVID is a more structural headwind" and "[w]e expect the market to take this news negatively."

105. During DPE's Sales and Revenue Call on January 24, 2024, for its second quarter of fiscal 2024, Meij, DPE's CEO, responded to a question about

[11] DPE's fiscal year ended on June 30, 2024.

whether "the business overexpanded during COVID in Japan" by acknowledging that DPE expanded in Japan too fast. He stated:

> Yeah. Look, in the near term, that is potentially one of the outcomes that we did put our foot to [the floor] so hard and that we've got some growing pains with our experience in management in the local market. So, yeah, that's a fair comment that we did grow extremely hard and extremely fast. And yeah, we've got a bit of a hangover in what we're doing. And unfortunately, due to the longer buy sides in Japan cycles, we need to – it just takes longer as we test and learn, test and learn. It's not as quick as other parts of our business.

Meij also stated that "at this point in time, Japan still isn't trading at the performance that we would like. We're really disappointed with the results."

106. When specifically asked "about extrapolating the Japan performance for FY 2025 and beyond? Is this a structural issue in Japan or is it solvable?," Meij responded, "I don't want to give guidance at this point." Similarly, when asked whether DPE was "more optimistic on the outlook for Japan compared to France," Meij reiterated that "we're not giving any guidance or anything today. I think we're in a mode where we have underperformed and I don't want to overpromise. We need to bring better results to the market. It's been executional. Management is in charge of execution."

107. Meij also conceded on this call that "[i]n the case of France, yes, it's been a lot more executional and that we've got new management in the area. And it's very clear, we haven't had success in France. . . . So I'm not going to

overpromise. We didn't overpromise at the full year or at the AGM on France. It's still work in progress, and we have a lot of work to do." Later on the call, he stated:

> Look, it's quite simply execution in France. I can't say that enough that we need to do better. That's the truth of today is that we've underperformed for a long period of time. That isn't good enough in France. The markets there in other categories of QSR, there is strong performance, and we haven't formed against that. When we're in the very early phases of some of our Centres of Expertise, we can see green shoot, but it needs more time. I don't want to overpromise and underdeliver on France because we haven't had a good track record to date.

108. On the same call, when an analyst questioned DPE's long-term store targets and the pressure they placed on DPE's business, Meij stressed that the company had reduced its targets for store additions. He stated that "[w]e're not aggressively chasing the store growth in this window" and "this was a moment to fix the core to energize the core and to become more efficient and that we would not be aggressively chasing store growth and hence, why we gave a much lower direction than what would happen in this 12 months." When asked about DPE's three- to five-year outlook, Meij added, "three to five-year outlook are outlooks, not guidance. And at this point in time, it's still be[ing] reviewed and constantly reviewed."

109. It was already clear when DPE provided its update in November 2023, that DPE did not expect "to return to our store growth outlook" until "FY25" because of problems in Japan and France. *See supra* ¶¶ 84-87. Domino's ignored that

information at its Investor Day the following month and reassured investors that DPE would contribute to the Company's annual net store growth guidance in 2024. Now, on January 24, 2024, DPE was taking the even-more dramatic step of withdrawing all guidance because of its poor performance in Japan and France.

110. The concerns about DPE's business in Japan and France continued, as demonstrated by DPE's February 21, 2024 press release. That release stated that "Mr. Meij said more work is needed to get the balance right in some of the Company's international markets, especially France." The release added that "France is receiving considerable focus from Domino's Global Centres of Expertise to regain momentum and is now growing delivery orders, however a current decline in carry-out has reduced weekly customer counts."

111. Accordingly, on February 22, 2024, DPE cut its dividend payout to shareholders by 18% due, in large part, to persistent issues in France. These issues were so severe that Meij had to proclaim that selling the French market "is not on the table." He attributed DPE's same-store sales decline in Europe as a whole to France, which was really "dragging that number down." In an article discussing the dividend cut, the *Australian Financial Review* noted that DPE "has had four profit downgrades in three years, due to the poor performance in France and lower-than-expected growth in Japan."

112. Even with DPE's heightened demonstration in January and February

2024 that its performance in Japan and France was struggling, Domino's made no changes to its net store growth guidance. The Company's stock continued to rise, even increasing from a closing price of $420.76 on February 21, 2024 to a closing price of $433.65 on February 23, 2024.

113. Despite DPE's poor results, analysts were reassured by the statements that Domino's had made downplaying the impact that DPE's problems would have on the Company's guidance. For example, in its February 23, 2024 report, Morgan Stanley maintained that "[s]ome of the international unit growth issues near term (i.e., [DPE], see below) we think have been factored in (925+ international openings targeted this year per [Domino's])." Morgan Stanley added that DPE missed consensus expectations in the most recent quarter, reduced its three-to-five year outlook for store additions, and reduced its short term targets for store additions in fiscal 2024. Morgan Stanley, however, viewed these issues as already "factored in" to the guidance from Domino's.

114. Following DPE's disclosure of increasing problems in Japan and France, during the Domino's Q4 2023 earnings call on February 26, 2024, Defendants not only failed to withdraw or update the Company's prior net store growth guidance, but even irrationally continued to tout that guidance and the Company's international business performance. During the call, Defendant Reddy emphasized that Domino's was "very confident in where we are with store openings

international and we've been talking to our master franchisees and have good visibility to our expectations there."

115. Domino's continued to publicly portray confidence in its global net store growth on April 29, 2024, during the Company's earnings call for the first quarter of 2024, when Defendant Reddy said Domino's "continue[s] to expect 1,100 or more" global net store openings in 2024, "which will be driven by 175 in the US and 925 in international." Notably, Domino's stuck with the store opening guidance that it gave at its Investor Day on December 7, 2023 and made no mention of DPE's struggles in Japan and France, either during its earnings call or in corresponding earnings release that continued to provide "Long-Term Guidance (2024 – 2028)" of "1,100+ Annual global net store growth." Following this earnings release, the Company's stock price increased from a closing price of $527.13 on April 29, 2024 to a closing price of $529.27 the following day.

116. DPE, however, continued to recognize difficulties in Japan and France when, at a May 27, 2024 European Strategy Day Presentation, it stated that "more time is required" for these markets. The following day, DPE's stock hit a 52-week low price and had declined 38.4% year-to-date. Despite this news from DPE, Domino's stock increased from a closing price of $502.16 on May 24, 2024 to a closing price of $510.01 on May 29, 2024. Investors plainly continued to view the bad news at DPE as already "factored in" by Domino's. *See supra* ¶ 113.

117. On June 26, 2024, as performance difficulties continued to persist, DPE's COO Michael Gillespie announced on LinkedIn his resignation from the company with no new venture in place. DPE did not make an official announcement about his departure and a DPE spokesperson told *iTnews*, an Australian business news publication, that Gillespie hadn't settled on "'a new challenge'" yet and would remain with DPE until mid-September, "after which he plans to take time to review different opportunities before embarking on his next challenge."

118. Then, on November 4, 2024, Reuters reported that Meij, DPE's longtime CEO since 2002, "was stepping down after more than two decades at the helm." The article explained the Meij "led the pizza franchise operator through its initial public offering in 2005, becoming Australia's first publicly listed pizza chain, and expanded its stores to 12 countries across Asia, Australia-New Zealand, and Europe. However, the firm had been struggling to maintain sales in a post-COVID era in most of its markets, key being Japan where it had targeted setting up 2,000 stores over a decade but had to pull back due to weak sale volumes and high costs." DPE's valuation had fallen from "A$14.46 billion in September 2021 when the shares hit an all-time high," to just A$3.12 billion on November 4, 2024. Jefferies viewed "this development [Meij's resignation as] positive because it paves the way

for the business to make the changes required to improve unit economics & restore growth."[12]

## G. Confidential Witnesses Describe DPE's Problems During the Class Period

119. Multiple confidential witnesses who are DPE franchisees confirm DPE's poor business practices.

120. Confidential Witness 1 ("CW 1") was a DPE franchisee in South Australia for 18 years, from 2006 to 2024.

121. This witness stated that nearly all of DPE's franchisees, including CW 1, did not make any money. This was because DPE imposed onerous financial restrictions on its franchisees, including requiring them to sell pizzas for A$15 (approximately $9.45 USD), which lost money. In addition, DPE told franchisees that they would break even after only A$10,000 in sales over the course of a week, but that was not even close. CW 1 stated that it actually cost between A$32,000 and A$38,000 to break even, depending on the cost of rent in different locations. Many stores therefore lost money. DPE lied to franchisees and sold them stores on this basis, making the franchisees think incorrectly that they would be able to break-even after selling A$10,000 per week. CW 1 stated that only big franchisees that had many stores in good locations many any money, but even some of them ended up selling

[12] 1 Australian dollar was worth $0.64 USD as of March 19, 2025. That is also within the exchange rate that existed during the Class Period.

out because it was not enough of a profit margin.

122. CW 1 stated that "I couldn't make any money as a franchisee and I worked so hard. I did everything that the other good franchisees did and what DPE told us. DPE killed the business by charging too many fees and too many promotions at a loss like the $15 pizzas." Similarly, CW 1 stated that "I gave my life to DPE for all those years and walked away with nothing. No money, no nest egg."

123. DPE would still make money because they would build a new store and then lease it to a franchisee. CW 1 described the system as "corrupted because DPE would make money at the expense of franchisees." CW 1 saw this take place every year that that they were associated with DPE, "but more so over the last 10 years." CW 1 stated that franchisees often "walked away," which "happened a lot." CW 1 described the system as "f***ed" and stated that "DPE rips off franchisees."

124. CW 1 also described how DPE avoided documenting these practices by only talking to franchisees and not allowing the franchisees to write anything down or record anything. This witness described DPE as "smart because they had good lawyers and they always made sure that anything they told us could not be used against them later on."

125. Another DPE franchisee described these same practices. CW 2 has been a DPE franchisee in Australia since 2013 and stated that they knew a lot about what went on at DPE over a long period of time. CW 2 was "not happy with DPE because

they have been squashing the profitability of our stores over a long period." This witness owned seven stores, but sold several of them because they do not see a future in the business and is still trying to sell the remainder that they own. CW 2 also stated that other franchisees that they spoke with were making even less money than they were.

126. CW 2 stated that "the guys who run DPE have been incompetent since I joined in 2013." This witness stated that Don Meij was DPE's "CEO for about 30 years until he was sacked." This witness described Meij as "delusional" and stated that "DPE was in a shambles because Don wanted to grow it at such a pace that it could not ever make any money." Meij insisted on sites "being built to such a high standard that new franchisees could never be profitable." CW 2 stated that they "went to all the franchisee meetings and nobody was making enough money." In addition, "new stores were not being bought by existing franchisees because we knew that you could not make money. Building and franchisor costs were too high."

127. This witness also stated that DPE "had big numbers of store openings in Japan off the back of the Olympics and COVID but it went completely the other way.[13] The Japanese just didn't want pizza." In addition, CW 2 reported that DPE's stores outside of Germany and Australia "were losing money big time."

---

[13] The summer Olympics were held in Tokyo in 2021.

128. CW 2 stated that DPE's leasing and accounting team "knew what was going on," including Samantha Thorburn. CW 2 interacted with Thorburn in connection with the leasing of CW 2's stores.[14] CW 2 described Thorburn as reporting to DPE's CEO, Meij, and as being in the inner circle of DPE's senior management.

129. These confidential witnesses described how DPE's basic business practices, including selling at steep discounts, did not support its franchisees being able to maintain their stores or open new ones. DPE admitted after the Class Period that these practices that made its stores unable to earn enough profit to justify their staying open was particularly acute in Japan because it was a "low frequency" market where stores had a lower amount of customer traffic.

130. On DPE's earnings call for its fourth quarter of 2024, which it held on August 20, 2024, Josh Kilimnik, DPE's CEO of Asia, explained that "[a] mistake" that Domino's made in Japan was that it reacted to inflation "by chasing customer traffic by over discounting or by high discount rates. But in hindsight, in a low frequency market, and this was really a rate to nowhere, and it didn't drive traffic enough to counter the cost in the business. And it was a little bit heavier because of

[14] Thorburn's LinkedIn profile states that she worked at DPE for nine years and four months, from August 2015 to November 2024. Meij left DPE that same time. *See supra* ¶ 118. Thorburn was the Head of Property for DPE from April 2022 to November 2024 and its National Property & Leasing Manager (Australia & New Zealand) from August 2015 to May 2022.

those inflation that hit the business." He also explained that DPE had grown too rapidly because it had assumed that "when COVID restrictions came off that" customers would "stay within the business" but "[t]his was not really the case in Japan." These were the same problems that DPE was already suffering from during the Class Period, as described by DPE and CWs 1 and 2. *See supra* ¶¶ 85-87, 105, 119-28. Similarly, later in the call, Meij admitted that DPE previously had to close 79 stores in Japan because of its "depth of discounting when we were rebounding in the inflationary period, as Martin said and Josh said, we made the mistake of chasing the customer with price in the low frequency market, that was a big mistake."

### H. Domino's Finally Admits That DPE's Problems Impacted the Company's Store Growth

131. Despite its knowledge of DPE's poor performance and inability to meet its store opening goals, it was not until July 18, 2024, after DPE announced the prior day that it will "close up to 80 low volume stores" in Japan and 20 to 30 stores in France while providing new net guidance for its own store openings, that Domino's suspended its long-term guidance for net store growth and reduced its expectations for 2024. In particular, on the earnings call that Domino's held on July 18, 2024 for Q2 2024, Defendant Reddy acknowledged DPE's announcement the prior day of closures in Japan and France and stated that as a result of this "pretty material update," Domino's expected to "see more pressure in the second half of this year." On the same call, Defendant Weiner said that in Japan DPE "probably split a little

too fast." Domino's "temporarily" suspended its long-term guidance "until the full effect of [DPE's] store opens and closures on international net store growth are known."

132. Upon suspending its long-term guidance, Domino's issued new 2024 guidance for global net store growth of 825 to 925 stores, lowered from its prior "floor" of at least 1,100 stores. The Company's expectations for U.S. net store growth remained the same, continuing "to expect 175+ net stores annually for 2024 to 2028." But the Company expected that its international net store growth would "fall 175 to 275 stores below its 2024 goal of 925+ net stores in international primarily as a result of challenges in both openings and closures being faced by Domino's Pizza Enterprises ('DPE'), one of its master franchisees."

133. While Domino's portrayed these developments as unexpected, they actually followed from DPE's recent performance. Domino's, however, had downplayed the risk of these closures, leading investors to conclude that DPE's poor performance was already "factored in" to the Company's net store opening guidance that it continued to reiterate throughout the Class Period.

134. In its July 17, 2024 press release, DPE supported its increased closures and decreased store openings in Japan and France by reiterating that it had "announced in June 2023 a wide-ranging strategic review to deliver cost savings, improved efficiencies and a foundation for future growth." It added that it "provided

an update on its performance at Investor Strategy Days in April and May 2024" and "Management advised specific works were underway in Japan and France, using insights from DPE's Centres of Expertise and external partners, to identify improvements for these markets."

135. These closures aligned with analysts' expectations for DPE given the prolonged persistence of underlying problems. In its July 17, 2024 report reacting to the news, Macquarie Equity Research stated, "The issues in France and Japan have been growing over the last couple of years" and "Store performance in France and Japan has continued to be soft." It added that "[w]e have been of the view that store count growth over the medium term was likely to be impacted due to weak store performance." Similarly, in its July 21, 2024 report reacting to the news, Citi expressed its belief that DPE was "making sensible decisions in closing underperforming stores in France (20-30, 4-6% of total France stores) and Japan (80, 8% of total Japan stores)."

### I. Domino's Was in Close Communication With DPE and Knew DPE's Current Condition At All Relevant Times

136. Although DPE's poor performance was not a surprise to observers of DPE, investors were surprised by how it impacted Domino's because during the Class Period, Domino's gave the misleading impression that DPE's problems were already accounted for and misrepresented that the Company's net store opening guidance was supported by DPE's performance at the time.

137. For example, in a July 18, 2024 report, Goldman Sachs explained that Domino's "management revised down its global net store growth to 825-925 in 2024 (from 1,100) and temporarily suspended its mid-term guidance metric of 1,100+ p.a. global net stores following updated targets from its international franchisees (specifically noting Domino's Pizza Enterprises (DMP.AX))." Goldman Sachs was "surprised by the large international unit growth guidance cuts, both in terms of the magnitude (c.20-30% cut vs. prior) and timing (i.e. mid-term targets were announced in Dec 2023)."

138. Domino's itself, however, cannot claim that it was surprised by DPE's poor performance because Domino's was at all times apprised of the current state of DPE's business. DPE was the Company's largest master franchisee, operating 3,840 stores in 12 international markets, which accounted for approximately 28% of Domino's international store count and 19% of its global store count at the end of 2023. *See supra* ¶¶ 51-55. Understanding the current state of DPE's business was crucial to Domino's.

139. Defendants also repeatedly admitted that they were in constant contact with DPE and had real-time knowledge of the status of DPE's geographic markets. For example:

a. During the February 26, 2024 conference call for Q4 2023, Defendant Reddy emphasized that Domino's was "very confident in where we are with store openings international and we've been talking to our master

franchisees and have good visibility to our expectations there." *See supra* ¶ 114.

b. At the June 14, 2023 at the Oppenheimer Consumer Growth & E-Commerce Conference, Reddy promoted growth potential in France where the market was not as penetrated as expected, and touted each of the Company's top 20 markets as having "very compelling economics." *See supra* ¶ 77.

c. On the Company's July 24, 2023 Q2 2023 earnings call, Reddy discussed "underperforming stores in certain challenged markets" and discussed DPE in particular, explaining that Domino's was confident about its guidance for 2024 because "one of our publicly traded master franchisees recently disclosed their intention to close an additional 65 to 70 underperforming stores," which would be "behind us" in 2024. *See supra* ¶¶ 78, 80.

d. At the September 13, 2023 Piper Sandler Growth Frontiers Conference, Reddy discussed the "underlying health" of DPE's markets, including "the six-week trend" in DPE's markets, which made Domino's "very confident" in its guidance going forward. *See supra* ¶ 81.

e. On the Company's earnings call for Q3 2023, held on October 12, 2023, Defendants Reddy and Weiner discussed DPE specifically, emphasizing that its store closures were one-time events. *See supra* ¶¶ 82-83.

f. At Investor Day, Defendants Weiner and Reddy again discussed the one-time nature of DPE's store closures in 2023, with Defendant D'Elia demonstrating specific knowledge the Company's international segment, and the "big potential" and "headroom" of the French and Japanese markets in particular. *See supra* ¶ 93.

g. Also at Investor Day, Defendant D'Elia described how "[w]e routinely conduct a number of analyses to help us estimate the full store potential of our international business. These are analyses such as sales and stores per capita, share of wallet, share of the pizza and QSR categories, et cetera. And when you triangulate these different analyses, what they show is the estimated full store potential of our international business is over 40,000 stores. So that means even with all the store growth that

we're going to deliver over the next five years, we will still have less than 50% of the estimated full store potential of our international business." *See infra* ¶ 160.

h. D'Elia also described at Investor Day that the Company's international marketing team and international analytics and insights team both worked closely "with our master franchisees to help them continue to successfully launch new incremental product innovations" and that Domino's was "also continuing to work with our master franchisees to capitalize on . . . adaptability of pizza."

i. Weiner explained on the Q4 2023 earnings call that for "Domino's Pizza Enterprises, our master franchisee over several markets, but especially France, there have been some challenges there, and that's one of our larger markets in Europe. We're partnering closely with them right now on those challenges." Weiner also showed his knowledge of DPE's other markets, stating that "[w]hat I'd point to for DPE in general, there are green shoots in a lot of the markets where they're really leaning in on. And so, for example, Australia, New Zealand, the numbers there have been fantastic." *See infra* ¶ 179.

140. Domino's was finally forced on July 18, 2024, to lower its net store opening guidance because, as Defendant Reddy explained on the Company's earnings call, "in fact, just yesterday, I think DPE put out a release with a number of closures that they outlined in the Japan and France market in particular." Reddy further admitted the close level of communication between Domino's and DPE, explaining "what went on in the background" between Domino's and DPE. He stated that "when you go back to the Investor Day back in December, I think one of the process that we went through was working with all of our master franchisees, including DPE, on the expectations that they had for the business. And we basically calibrated to that for both 2024 and the five-year horizon as well." Weiner also

confirmed that "certainly, we're working with DPE" and "partnering closely with DPE as they work through this process."

141. Although Reddy tried on this July 18, 2024 earnings call to portray Domino's and DPE "at that time" of Investor Day as "completely aligned," that description is belied by DPE's own characterizations of its business at the time. Reddy also tried to excuse the Company's delayed acknowledgment of the problems at DPE by mischaracterizing the timeline of events and describing them as not starting until "we got into the end of the Q1 call and then we got into the second quarter."[15] But DPE's problems were apparent even before Investor Day and by January 24, 2024—***the beginning of the first quarter***—DPE already retracted its guidance, advising that "***any previous guidance for FY24 performance, de facto or otherwise, is no longer in effect.***" Reddy stated that Domino's "continued to engage with the DPE team to validate the forecast that we had for the year. And it became pretty clear as we actually went through that conversation and discussion that . . . it was a pretty material update that we were going to see in the numbers for this year, and we felt it appropriate to update our guidance for 2024." But Reddy

[15] Reddy stated: "So then, actually we got into the end of the Q1 call and then we got into the second quarter, and we started seeing that relative to our expectations in cadence, both new store openings as well as closures really started increasing from DPE."

mischaracterized the timing of the Company's knowledge when DPE's own descriptions of its business make clear that the problems arose much earlier.

142. Then, at the Piper Sandler Growth Frontiers Conference on September 11, 2024, when asked about Domino's having lowered its international outlook "predominantly related to Domino's Pizza Enterprises," Defendant Reddy admitted further why DPE caused Domino's to change its net store opening guidance and the level of communication between Domino's and DPE:

> So the whole adjustment in terms of store guidance was really driven by primarily Domino's Pizza Enterprises. And I think outside of that, there are probably some puts and takes, but by and large, everything's kind of like on track for us to be fairly comfortable with where we are.
>
> The Domino's Pizza Enterprises situation, I think they've talked a little bit more. They did a press release the day before earnings call and they subsequently reported their final results in August. And they talked specifically about a couple of markets in the portfolio, more extensively Japan and France. That's true. They've actually had some concerns with Japan in particular with store openings that may have actually happened too rapidly that they had to close.
>
> And I think in France they've actually had some operational execution issues in France, which has caused stores to become unprofitable and therefore closed. And I think it's put some pressure also on the opening, because of where store economics are in some of those markets. . . .
>
> We're working very closely with them. I'm seeing updates every week. We're having conversations every month. And so, as we report in the third quarter, we'll actually have more visibility based on what we've learned, and we'll continue to update, we won't wait.

143. In sum, Defendants were in close communication with DPE—the Company's largest master franchisee—and knew in real time during the Class Period the difficulties that DPE was having in Japan and France that undercut Domino's ability to meet its annual global net store growth guidance.

### J. <u>The Individual Defendants Profited from their Fraud</u>

144. Defendants Weiner and Jordan were motivated by substantial financial benefits to engage in the fraud here.

145. Defendants Weiner and Jordan engaged in suspicious sales of Domino's stock before the Company announced the suspension of its long-term global net store growth guidance.

146. On February 20, 2024, Defendant Weiner sold 15,960 shares, at prices ranging between $417.17 and $420.62 per share, for proceeds of $6,677,879.32. Weiner owned 30,519 Domino's securities following these sales and 46,479 before them. He thus sold approximately 34% of his Domino's securities in this transaction.

147. Then, on April 29, 2024, Defendant Weiner sold 11,780 shares, at prices ranging between $524.24 and $538.28 per share, for proceeds of $6,200,586.44. Weiner owned 32,001 Domino's securities following these sales and 43,781 before them. He thus sold approximately 27% of his Domino's securities in this transaction.

148. All of these sales were conducted in open-market transactions immediately following the exercise of options. The options for the February 20, 2024 transactions were exercisable since July 16, 2018. The options for the April 29, 2024 transactions were exercisable since July 15, 2019. These options thus did not have to be exercised at this time. Weiner also chose to immediately sell the shares that he obtained from these options for net profits of $10,316,346.20 total ($5,512,160.92 for the February 20, 2024 transactions and $4,804,185.24 for the April 29, 2024 transactions). Defendant Weiner thus made an extraordinary profit of approximately $10.3 million by strategically selling his shares before Domino's withdrew its net store opening guidance on July 18, 2024.

149. The Form 4s that Weiner filed with the SEC for these transactions show that his transactions on April 29, 2024, and his exercise of options on February 20, 2024—but not his sales on February 20, 2024—were "effected pursuant to a 10b5-1 trading plan adopted by the reporting person on October 23, 2023." Weiner thus made blatant open market sales on February 20, 2024. Moreover, the transactions that he conducted pursuant to a 10b5-1 trading plan are also highly suspicious because that plan was adopted shortly before these transactions. By October 23, 2023, DPE and Domino's already knew that DPE's problems would continue into 2024 because it was just nine days before DPE's annual report on November 1,

2023.[16] Moreover, the problems that DPE later admitted to having caused its store closures during the Class Period were issues that existed from before the Class Period. *See supra* ¶¶ 129-30.

150. Weiner's sales are even more suspicious because these are the only open-market sales that he made in the comparable time before the Class Period, or even since August 4, 2021. The only other sales that Weiner made since August 4, 2021 were non-open market transactions that were made for tax purposes in connection with his receipt of equity awards and did not provide him with any profit—unlike the $10.3 million in profit that he made during the Class Period. Moreover, the only shares that Weiner actually acquired during the Class Period were through his exercise of options that he immediately sold for substantial profit on February 20 and April 29, 2024.[17]

---

[16] The Class Period starts shortly thereafter, on December 7, 2023, because that is when Defendants next made actionable statements, at the Investor Day held that day.

[17] While Weiner's Form 4s show that he also acquired 1,038 shares on January 24, 2024 and 3,126 shares on March 11, 2024, those transactions merely reflected shares earned upon vesting of performance-based restricted stock units, or restricted stock unit awards ("RSUs") that did not vest until the following year (at which point one-third of the award vested each year). Weiner did not pay anything to acquire these shares or RSUs.

151. Weiner owned at most 29,784 shares before the Class Period (at least several thousand of which were merely RSUs).[18] The 27,740 shares that he sold on February 20, 2024 and April 29, 2024 combined thus accounted for 93% of the amount of shares that he held before the Class Period and 48% of his shares if those 27,740 shares that he acquired through the exercise of options and immediately sold are added to his total.

152. In sum, Weiner's Class Period transactions in Domino's stock, through which he received $10.3 million in profit, are highly suspicious by all measures.

153. On February 28, 2024, Defendant Jordan sold 2,630 shares for $446.06 per share, for proceeds of $1,173,137.80. Like Weiner, Jordan exercised options and immediately sold all of those shares in open market transactions. After accounting for the exercise price of these options, Jordan made a net profit of $861,378 from these sales. Jordan's options were exercisable since July 15, 2019, but he waited until the Class Period to profit from them, before Domino's lowered its net store growth guidance. Furthermore, Jordan did not make any of these February 28, 2024 transactions pursuant to a 10b5-1 trading plan.

154. Jordan's stock sales are also suspicious because he did not make any open market sales in the comparable time before the Class Period. All of Jordan's

[18] For example, Weiner's holdings include 5,831 RSUs that he acquired on March 10, 2023 that did not vest until a three-year period beginning on March 10, 2024, with two-thirds of those shares remaining unvested during the Class Period.

other transactions since the start of 2023 were either the free acquisition of RSUs that did not fully vest until after the Class Period, the free acquisition of "shares earned upon vesting of performance-based restricted stock units," or other non-open market transactions that involved sales for tax purposes accompanying equity awards.

155. Jordan owned, at most, 6,545 Domino's shares before the start of the Class Period.[19] He sold 2,630 on February 28, 2024, which amounted to at least 40.2% of the shares that Jordan owned at the start of the Class Period and at least 28.7% of his shares after accounting for the 2,630 that he acquired through the exercise of options and immediately sold.

156. In sum, by all measures, Defendants Weiner and Jordan's open market stock sales during the Class Period that netted them over $11.16 million are highly suspicious. These were the only open market transactions in Domino's shares that Defendants Weiner and Jordan conducted during the Class Period and they did not make any such sales in the comparable period before the Class Period. These transactions were for a substantial portion of these Defendants' total Domino's shares. Defendants Weiner and Jordan also sold all of these shares at artificially inflated prices, for substantially more than the $409 per share that the Company's

[19] Like Weiner, a substantial portion of these shares did not vest until after the Class Period, such as the 3,749 RSUs that Jordan acquired on March 10, 2023, but only two-thirds of which vested before the end of the Class Period.

share price fell to following the corrective disclosure on July 18, 2024 (*see infra* ¶ 206), netting them substantially more profit than they would have received if Domino's stock was not inflated by their false and misleading statements.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

157. Throughout the Class Period, Defendants made materially false and misleading statements regarding the business and operations of Domino's. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (a) the Company's guidance for global net store growth was not supported in light of the problems that DPE faced in Japan and France; and (b) the Company's international segment was performing worse than Defendants represented as a result of the problems that DPE faced in Japan and France.

158. The Class Period begins on December 7, 2023, when Defendants Weiner, Reddy, D'Elia, and Jordan all spoke at the Company's Investor Day. As part of his opening remarks, Defendant Weiner said when describing global net store growth, "[a]gain, we're going to go away from a range to a number. 1,100 around the world. These are net numbers and Sandeep will break down the US and international. I'll look for you in a little bit, but again, 1,100 is the floor. We're looking to deliver more."

159. The foregoing statements in ¶ 158 were materially false and misleading because the Company's guidance for global net store growth was not supported in light of the problems that DPE faced in Japan and France.

160. As part of his opening remarks at Investor Day, Defendant D'Elia said, "Now, we're really excited obviously to expand our international store portfolio to over 18,500 stores in the next five years. But what we're even more excited about is the long-term growth potential of our international business. We routinely conduct a number of analyses to help us estimate the full store potential of our international business. These are analyses such as sales and stores per capita, share of wallet, share of the pizza and QSR categories, et cetera. And when you triangulate these different analyses, what they show is the estimated full store potential of our international business is over 40,000 stores. So that means even with all the store growth that we're going to deliver over the next five years, we will still have less than 50% of the estimated full store potential of our international business."

161. The foregoing statements in ¶ 160 were materially false and misleading because (a) the Company's guidance for global net store growth was not supported in light of the problems that DPE faced in Japan and France and (b) the Company's international segment was performing worse than Defendants represented as a result of the problems that DPE faced in Japan and France. These statements were particularly misleading because they based the Company's plans to "expand our

international store portfolio" and "long-term growth potential of our international business" on its "analyses" of the current state of its international business while failing to disclose how the problems that DPE's business continued to face impacted Domino's.

162. During his opening remarks at Investor Day, Defendant Reddy said, "international, we expect again to do 925 plus stores in international. I think this year has been characterized by a number of idiosyncratic closures. Hopefully, most of that is the rear view mirror. And as we move forward next year, with all the initiatives that we're talking about, we should be back on track with the 925, at least in 2024, and then accelerate from there to do more beyond that."

163. Similarly, when discussing net store growth guidance, Defendant Weiner said, "[o]n the international side, I said this in the Q3 call, a lot of that was driven by closures and kind of onetime special closures. If you take out some of the closures from Domino's Pizza Enterprises and Russia, I think we only closed like 15 stores in Q3. And so those onetime things will get behind us. And that's essentially why we gave a floor with more because if we think about guidance, we want you to understand where we're getting back to and that we're going to continue to grow."

164. The foregoing statements in ¶¶ 162-63 were materially false and misleading because (a) the Company's guidance for global net store growth was not supported in light of the problems that DPE faced in Japan and France and (b) the

Company's international segment was performing worse than Defendants represented as a result of the problems that DPE faced in Japan and France. These statements were particularly misleading because they mischaracterized the poor performance "this year" in the international segment, which was attributable to DPE, to "idiosyncratic closures" and "onetime special closures" that were in "the rear view mirror" when DPE continued to face those problems.

165. Also at Investor Day, an analyst asked whether the "very big number" that Domino's gave for international store growth "require[d] a lot more new markets versus the ones you're already in." Defendant D'Elia responded that "the shape of our store growth [over the longer term] should follow a very similar pattern to how I explained it over the next five years." After discussing less developed markets, he then assured that "I also don't want you to take away that we don't have headroom left in our developed markets. So I'll also unpack those a little bit. . . . We still have tons of headroom in France and Germany. Those are big market potentials for us. And then Japan, who just opened up their 1,000th store, but we also think that we have big potential on that market."

166. The foregoing statements in ¶ 165 were materially false and misleading because (a) the Company's guidance for global net store growth was not supported in light of the problems that DPE faced in Japan and France and (b) the Company's international segment was performing worse than Defendants represented as a result

of the problems that DPE faced in Japan and France. These statements were particularly misleading because D'Elia specifically went out of his way to promote the Company's "developed markets," including France and Japan, as supporting the Company's international net store growth guidance.

167. Also on December 7, 2023, Domino's published a presentation in conjunction with Investor Day titled "Domino's 2023 Investor Day" (the "Investor Day Presentation") listing Defendant Weiner as Chief Executive Officer on an individual slide and Defendants Reddy, D'Elia and Jordan on its "Today's Presenters and Q&A Panel" slide. Throughout the Investor Day Presentation, Domino's touted its strategy to add "MORE STORES" and reiterated "New Guidance" for "Annual Global Net Unit Growth" of "1,100+" stores:



168. This new long-term guidance is referenced on six slides, titled "New Long-Term Guidance Drives More (2024-2028)," "'Hungry for More' in Context – Growth Under New Guidance (2024-28)," "Longer-Term, the Runway for International Store Growth is Immense," "New Long-Term Guidance Drives More (2024-2028)," "More Stores," and "We Are Just Getting Started." On the slide titled "Longer-Term, the Runway for International Store Growth is Immense," Defendants stated that the Company's "2028 Target" for total international stores is "~18,500+ stores" and its "Long-Term Potential" is "40,000+ Stores."

169. The slide titled "More Stores" added that Domino's long-term guidance calls for 925+ "International Annual Net Store Growth" and "5,500+ Incremental" global net store growth by 2028:



170. The foregoing statements in ¶¶ 167-69 were materially false and misleading because (a) the Company's guidance for global net store growth was not supported in light of the problems that DPE faced in Japan and France and (b) the Company's international segment was performing worse than Defendants represented as a result of the problems that DPE faced in Japan and France.

171. Additionally, the slide titled "Unmatched Portfolio of International 'Master Franchisees'" provided Domino's "Latest Medium-Term Store Growth Guidance" for DPE as being 7,100 stores by 2033:

**Unmatched Portfolio of International "Master Franchisees"**

| Public Master Franchisees | Market Cap ($B) | Listing | Current Stores | Latest Medium-Term Store Growth Guidance |
|---|---|---|---|---|
| Jubilant FoodWorks Ltd. | $4.2 | JUBLFOOD (NSE) | 1,961 | 3,000 by 2029 |
| Domino's Pizza Enterprises Ltd. | $3.0 | DMP (ASX) | 3,782 | 7,100 by 2033 |
| Alsea S.A.B. de C.V. | $2.8 | ALSSF (BMV) | 1,401 | 2,000+ by 2027 |
| Domino's Pizza Group PLC. | $2.0 | DOM (LON) | 1,288 | +200 in Med. Term |
| DPC Dash Ltd. | $1.0 | 1405 (HK) | 716 | +240 in 2024 |
| Alamar Foods Co. | $0.8 | 6014 (TADAWUL) | 600 | - |
| DP Eurasia N.V. | $0.1 | DPEU (LON) | 691 | 1,250 Total |
| **Total** | **~$14B** | | **~10,500** | |

Sources: Respective Investor Relations websites, company filings, and supplemental store count disclosures. Market capitalization numbers as of Sept. 8 (except Alamar and DPC Dash as of Sept. 7) and adjusted for local currency. Store count data as of latest release as of 10/25

ALL RIGHTS RESERVED © 2023 DOMINO'S PIZZA LLC | 2023 DOMINO'S INVESTOR DAY

172. The foregoing statements in ¶ 171 were materially false and misleading because (a) the Company's guidance for global net store growth was not supported in light of the problems that DPE faced in Japan and France and (b) the Company's

international segment was performing worse than Defendants represented as a result of the problems that DPE faced in Japan and France. These statements were particularly misleading because Defendants presented the Company's international master franchisees as a strength that supported the Company's growth plans when in reality, DPE continued to suffer from its problems. In addition, it was highly misleading to present DPE's store growth guidance of 7,100 stores by 2033 while omitting that DPE's ongoing problems made Domino's shorter-term guidance through 2028 unreasonable.

173. On January 8, 2024, Defendants Weiner and Reddy spoke at the ICR Conference. In response to an analyst question regarding how Domino's plans to achieve the acceleration of net store growth that its guidance calls for, Defendant Reddy said, "on the international business, we talked about some idiosyncratic closures that we've experienced in 2023 that really, hopefully, are mostly behind us as we go into 2024. And those are the two tailwinds, in particular, that actually help us as we move forward."

174. The foregoing statements in ¶ 173 were materially false and misleading because (a) the Company's guidance for global net store growth was not supported in light of the problems that DPE faced in Japan and France and (b) the Company's international segment was performing worse than Defendants represented as a result of the problems that DPE faced in Japan and France. These statements were

particularly misleading because they mischaracterized the poor performance in 2023 in the "international business," which was attributable to DPE, to "idiosyncratic closures that we've experienced in 2023."

175. On February 26, 2024, Domino's filed with the SEC a Form 8-K signed by Defendant Reddy that attached a press release issued the same day announcing the Company's 4Q2023 and FY2023 financial results. This press release stated, "The Company hosted its Investor Day on December 7, 2023, and announced the following long-term guidance metrics that the Company continues to expect to achieve," including "1,100+ [a]nnual global net store growth." The press release also quoted Defendant Weiner as reaffirming that guidance by stating that the Company's "Hungry for MORE strategy" that "we recently unveiled at our Investor Day, is our plan to deliver MORE sales, MORE stores and MORE profits."

176. Also on February 26, 2024, Domino's held an earnings call with analysts and investors in conjunction with its 4Q2023 and FY23 financial results, on which Defendants Weiner and Reddy spoke. As part of his opening remarks, Defendant Weiner said, "Hungry for MORE is our new strategy around what we're going to do to deliver over the course of the next five years, more sales, more stores and more profits." As part of his opening remarks, Defendant Reddy said, "Internationally, we are expecting to increase net store growth each quarter over the prior year, as we lap the one-time closures we had in 2023 and to step up significantly

in the back half of the year."

177. In response to an analyst question regarding the Company's confidence in the acceleration of global unit growth in light of international having been "a little bit on the softer side" the past quarter, Defendant Weiner replied that "[w]e still feel really strongly about the guidance we gave, the 1,100-plus stores and 5,500 over the next five years." Weiner added, "Internationally, I think we've got a lot of closures behind us. That was probably one of the things that was driving down the number this year. But those closures are really focused on three areas," including "Domino's Pizza Enterprises." Defendant Weiner concluded his response by stating, "as we look forward, we feel really confident about openings."

178. In response to the same analyst question, Defendant Reddy said, "we're expecting to actually grow against last year as we lap the closures and then significantly accelerate more in the back half of the year. So, very confident in where we are with store openings international. And we've been talking to our master franchisees and have good visibility to our expectations there."

179. Similarly, in response to an analyst question regarding a slowdown in performance in Europe, Defendant Weiner said, "Our European business is really strong, and we believe some of the pressures we're seeing there are generally transitory in nature. If you listen to the call from DPE, Domino's Pizza Enterprises, our master franchisee over several markets, but especially France, there have been

some challenges there, and that's one of our larger markets in Europe. We're partnering closely with them right now on those challenges. What I'd point to for DPE in general, there are green shoots in a lot of the markets where they're really leaning in on. And so, for example, Australia, New Zealand, the numbers there have been fantastic." He added, DPE "give[s] a little insight into Japan into the first kind of six, seven weeks of the second half and how that seems to have turned a corner."

180. The foregoing statements in ¶¶ 175-79 were materially false and misleading because (a) the Company's guidance for global net store growth was not supported in light of the problems that DPE faced in Japan and France; (b) the Company's international segment was performing worse than Defendants represented as a result of the problems that DPE faced in Japan and France; and/or (c) by this time, DPE had already withdrawn "any previous guidance for FY24 performance, de facto or otherwise," stating that it was "no longer in effect" (*see supra* ¶¶ 102-08). These statements were particularly misleading because they mischaracterized the poor performance in 2023 as "one-time closures we had in 2023," with "a lot of closures behind us" that were "driving down the number this year," and reassured investors that DPE's performance in France and Japan would not detract from the Company's guidance, including because pressures in Europe "are generally transitory in nature" and Japan already "seems to have turned a corner."

181. Also on February 26, 2024, Domino's filed its Form 10-K with the SEC for the year ended December 31, 2023 ("2023 10-K"). Defendants Weiner and Reddy signed the 2023 10-K and also signed the certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), as the Principal Executive Officers of the Company, attesting to the accuracy of the statements therein.

182. The 2023 10-K also stated the following regarding risks associated with the Company's ability to implement its growth strategy:

> ***If we fail to successfully implement our growth strategy, which includes opening new stores and generating more sales, our ability to increase our revenues and operating profits could be adversely affected.*** …
>
> Our failure to add new stores would adversely affect our ability to increase revenues and operating income. Additionally, our growth strategy and the success of new stores depend in large part on the availability of suitable store sites and leases. We and our franchisees are currently planning to expand our U.S. and international operations in many of the markets where we currently operate and in select new markets. This may require considerable management time as well as start-up expenses for market development before any significant revenues and earnings are generated. Operations in new markets may achieve low margins or may be unprofitable, and expansion in existing markets may be affected by local economic and market conditions. In addition, we expect to continue our strategy of building additional stores in markets and regions where we have existing stores, a strategy we refer to as "fortressing," which may negatively impact sales at existing stores. Therefore, as we continue to expand, we or our franchisees may not experience the gross margins we expect, our results of operations may be negatively impacted, and our stock price may decline.

183. Additionally, the 2023 10-K stated the following regarding risks associated with Domino's dependence on the success of its franchisees, referencing DPE in particular, which was the Company's "largest international master franchisee [and] operated 3,840 stores in 12 markets, which accounted for approximately 28% of our total international store count":

> ***Our earnings and business growth strategy depend on the success of our franchisees, and we may be harmed by actions taken by our franchisees, or employees of our franchisees, that are outside of our control.*** …
>
> Our international master franchisees are generally responsible for the development of significantly more stores than our U.S. franchisees. As a result, our international operations are more closely tied to the success of a smaller number of franchisees than our U.S. operations. As of December 31, 2023, our largest international master franchisee operated 3,840 stores in 12 markets, which accounted for approximately 28% of our total international store count. Our U.S. and international franchisees may not operate their franchises successfully. If one or more of our key franchisees were to be unsuccessful, become insolvent or otherwise were unable or unwilling to pay us our royalties or other amounts owed, our business and results of operations would be adversely affected.

184. The foregoing statements in ¶¶ 181-83 were materially false and misleading because (a) the Company's guidance for global net store growth was not supported in light of the problems that DPE faced in Japan and France; (b) the Company's international segment was performing worse than Defendants represented as a result of the problems that DPE faced in Japan and France; and (c) by this time, DPE had already withdrawn "any previous guidance for FY24

performance, de facto or otherwise," stating that it was "no longer in effect" (*see supra* ¶¶ 102-08). These statements were particularly misleading because they discussed generic risks associated with the Company's master franchisees, including DPE, while omitting the problems that already existed at DPE and made the Company's "earnings and business growth strategy" unreasonable.

185. On March 15, 2024, Domino's filed with the SEC its 2023 Annual Report to Security Holders, which included a letter addressed to Domino's shareholders signed by Defendant Weiner. In the letter, Defendant Weiner said, "Our team members, franchisees and executive team are Hungry for MORE, and this confidence is reflected in our updated and more aggressive outlook for the next five years." He added, "We aim to open 1,100+ net new stores annually worldwide, bringing us to at least 5,500 additional stores over the next five years." Defendant Weiner concluded the letter by stating, "with the launch of our Hungry for MORE strategy, our ambition and confidence in our brand and Domino's ability to win has never been higher. Our intent is to translate more sales, more stores and more profits into more shareholder returns. That is the ultimate measure of our success."

186. The foregoing statements in ¶ 185 were materially false and misleading because (a) the Company's guidance for global net store growth was not supported in light of the problems that DPE faced in Japan and France and (b) by this time,

DPE had already withdrawn "any previous guidance for FY24 performance, de facto or otherwise," stating that it was "no longer in effect" (*see supra* ¶¶ 102-08).

187. On April 29, 2024, Domino's filed with the SEC a Form 8-K signed by Defendant Reddy that attached a press release issued the same day announcing the Company's 1Q2024 financial results. In this press release, Defendant Weiner is quoted as saying "Our first quarter results demonstrated that our Hungry for MORE strategy is off to a strong start: delivering MORE sales, MORE stores, and MORE profits" and "We are laser focused on driving franchisee profitability and store growth, which will fuel the Company's ability to win and create meaningful long-term value for our shareholders." The press release also stated that "[t]he Company continues to expect to achieve the following long-term guidance metrics previously announced," including "1,100+ Annual global net store growth."

188. The foregoing statements in ¶ 187 were materially false and misleading because (a) the Company's guidance for global net store growth was not supported in light of the problems that DPE faced in Japan and France; (b) the Company's international segment was performing worse than Defendants represented as a result of the problems that DPE faced in Japan and France; and (c) by this time, DPE had already withdrawn "any previous guidance for FY24 performance, de facto or otherwise," stating that it was "no longer in effect" (*see supra* ¶¶ 102-08). It was particularly misleading to affirm the Company's global net store growth guidance

based on the Company's first quarter results without disclosing how the problems that DPE was suffering at the time in Japan and France would impact that guidance.

189. Also on April 29, 2024, Domino's filed its Form 10-Q with the SEC for the quarter ended March 24, 2024 ("1Q2024 10-Q"). Defendant Reddy signed the 1Q2024 10-Q and Defendants Weiner and Reddy signed the certifications pursuant to SOX, as the Principal Executive Officers of the Company, attesting to the accuracy of the statements therein.

190. The 1Q2024 10-Q stated, "Revenues from international franchise royalties and fees increased $2.3 million, or 3.3%, in the first quarter of 2024 primarily due to an increase in the average number of international franchised stores open during the period resulting from net store growth, as well as higher same store sales." It also stated, "Domino's experienced global retail sales growth during the first quarter of 2024, driven by same store sales growth and net store growth in both our U.S. and international businesses. These factors also contributed to an increase in income from operations."

191. The foregoing statements in ¶¶ 189-90 were materially false and misleading because (a) the Company's international segment was performing worse than Defendants represented as a result of the problems that DPE faced in Japan and France and (b) by this time, DPE had already withdrawn "any previous guidance for FY24 performance, de facto or otherwise," stating that it was "no longer in effect"

(*see supra* ¶¶ 102-08). It was particularly misleading to attribute the Company's increase in revenues from international franchise royalties and fees in the first quarter of 2024 "to an increase in the average number of international franchised stores open during the period resulting from net store growth" and to promote the Company's "increase in income from operations" and "global retail sales growth during the first quarter of 2024" as driven by "net store growth in both our U.S. and international businesses," without disclosing the problems that DPE was suffering at the time in Japan and France that were negatively affecting the Company's ability to meet its guidance for net store growth.

192. On April 29, 2024, Domino's held an earnings call with analysts and investors in conjunction with its 1Q2024 financial results on which Defendants Weiner and Reddy spoke. As part of his opening remarks, Defendant Weiner said, "Our Q1 results demonstrated that our Hungry for MORE strategy is delivering on its promise, driving MORE sales, MORE stores and MORE profit." He added, "Our first quarter results clearly show that our strategy is resonating with customers. This gives me great confidence that we can deliver against our short- and long-term Hungry for MORE goals and drive significant value creation for our shareholders."

193. Then, as part of his opening remarks on this call, Defendant Reddy said, "Now shifting to net stores, where we continue to expect 1,100 or more, which will be driven by 175 in the US and 925 in international."

194. The foregoing statements in ¶¶ 192-93 were materially false and misleading because (a) the Company's guidance for global net store growth was not supported in light of the problems that DPE faced in Japan and France; (b) the Company's international segment was performing worse than Defendants represented as a result of the problems that DPE faced in Japan and France; and (c) by this time, DPE had already withdrawn "any previous guidance for FY24 performance, de facto or otherwise," stating that it was "no longer in effect" (*see supra* ¶¶ 102-08). It was particularly misleading to affirm the Company's global net store growth guidance based on the Company's first quarter results without disclosing how the problems that DPE was suffering at the time in Japan and France would impact that guidance.

195. On May 30, 2024, Defendant Weiner spoke at the Bernstein Strategic Decisions Conference. In response to an analyst question regarding the rationale behind certain international markets performing above and below expectations, Defendant Weiner said that DPE "just had an investor meeting the other day and they talked about some positive things and how they're turning around and part of the way they're turning around Australia is through Hungry for MORE and really driving food deliciousness."

196. Then, when discussing his top takeaways from the conference, Defendant Weiner said, "It's all about Hungry for MORE strategy. It's MORE sales,

MORE stores, MORE profit. That's what Hungry for MORE is there to deliver. Hopefully you understood that, maybe a secret weapon for us is this carryout thing people don't really know much about and how is driving store growth."

197. The foregoing statements in ¶¶ 195-96 were materially false and misleading because (a) the Company's guidance for global net store growth was not supported in light of the problems that DPE faced in Japan and France; (b) the Company's international segment was performing worse than Defendants represented as a result of the problems that DPE faced in Japan and France; and (c) by this time, DPE had already withdrawn "any previous guidance for FY24 performance, de facto or otherwise," stating that it was "no longer in effect" (*see supra* ¶¶ 102-08).

198. On June 10, 2024, Defendant Reddy spoke at the Oppenheimer Consumer Growth and E Commerce Virtual Conference. In response to an analyst question regarding what drives the Company's confidence in its guidance, Defendant Reddy said, "I think from a store count perspective, we're expecting to do 1,100 stores per year." In response to an analyst question regarding why international remains such a powerful and confident growth engine for Domino's and what gives Domino's confidence that it can reach its long-term net store guidance, Defendant Reddy said, "I think in the long term, there's plenty of potential.

We have 90-plus markets and we have significant master franchisees across our network."

199. Also at this conference, when discussing pressure put on Domino's because of DPE's performance, Defendant Reddy said, "it doesn't change the long-term trajectory of the business and the equation of where we can actually take the business. So, overall, we feel pretty good about it." He added, "longer-term, I think we're very confident. The markets in which we are operating, we actually have great presence in, we have our share gain possibilities which are pretty significant in most of the markets in which we operate. And that will come through unit growth."

200. The foregoing statements in ¶¶ 198-99 were materially false and misleading because (a) the Company's guidance for global net store growth was not supported in light of the problems that DPE faced in Japan and France; (b) the Company's international segment was performing worse than Defendants represented as a result of the problems that DPE faced in Japan and France; and (c) by this time, DPE had already withdrawn "any previous guidance for FY24 performance, de facto or otherwise," stating that it was "no longer in effect" (*see supra* ¶¶ 102-08).

## VI. <u>THE TRUTH EMERGES</u>

201. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

202. Throughout the Class Period, the price of Domino's securities were artificially inflated and/or maintained at an artificially high level as a result of Defendants' materially false and misleading statements and omissions identified herein.

203. The price of Domino's securities significantly declined when the misrepresentations made to the market, and/or the information and risks alleged herein to have been concealed from the market, and/or the effects thereof, materialized and/or were revealed, causing investors' losses. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Domino's securities, Plaintiff and other Class members have suffered significant losses and damages.

204. In particular, on July 18, 2024, Domino's issued a press release before the market opened, announcing the Company's Q2 2024 financial results. In the press release, when discussing expectations for its annual global net store growth, Domino's stated:

> International: The Company expects it will fall 175 to 275 stores below its 2024 goal of 925+ net stores in international primarily as a result of challenges in both openings and closures being faced by Domino's Pizza Enterprises ("DPE"), one of its master franchisees. The Company is partnering closely with DPE as they work through this process and will provide further updates once it has more visibility into the effect on its annual global net store growth numbers.

As a result, Domino's announced that it was "temporarily suspending its guidance metric of 1,100+ global net stores until the full effect of DPE's store opens and closures on international net store growth are known."

205. That same day on the Company's 2024 earnings call before the market opened, when asked to discuss the dynamic of the Company's disappointing new store guidance, Defendant Reddy responded:

> And so I think when you go back to the Investor Day back in December, I think one of the process that we went through was working with all of our master franchisees, including DPE, on the expectations that they had for the business. And we basically calibrated to that for both 2024 and the five-year horizon as well. And at that time, we were completely aligned. So then actually we got into the end of the Q1 call and then we got into the second quarter and we started seeing that relative to our expectations and cadence, both new store openings as well as closures really started increasing from DPE.
>
> And as we saw that, we continued to engage with the DPE team to validate the forecast that we had for the year. And it became pretty clear as we actually went through that conversation and discussion that there was not only the risk to the second quarter that we were seeing, but clearly the outlook was going to be impacted as well. And in fact, just yesterday I think DPE put out a release with a number of closures that they outlined in the Japan and France market in particular, which they're targeting for their first half, which is our second half, which therefore will land in this fiscal year. So apart from what we've seen in second quarter, we expect to see more pressure in the second half of this year.

206. The Company's stock price fell that day in response to this news, dropping 13.57%, or $64.23 per share, to close at $409.04 per share on July 18, 2024

(from a closing price of $473.27 on July 17, 2024), on unusually heavy trading volume that was 4.68 times the 20-day moving average.

207. Market analysts reacted immediately to this surprising news. In its first report on July 18 2024, Citi explained "the crux of the frustration will stem from a suspension of unit growth guidance merely 8 months after [Domino's] issued new longer-term targets." While referencing the Company's store closures, it added, "this unexpected update will shake investor confidence in the company's broader guidance and put pressure on a stock that has held a premium multiple vs. global quick-service peers in recent quarters on the back of greater relative visibility into longer-term drivers of the business."

208. In its second report of the day reacting to the news, Citi emphasized in the report's title that "Slice to Unit Growth Means Choppy N/T Narrative." When discussing its takeaways, Citi added that Domino's faces a "tough narrative in the immediate future" and "particularly with questions about the unit growth trajectory, longer-term investors might need more than a 25% pullback/a still mid-20's NTM P/E (on our estimates) to view the pullback as a compelling entry point." Additionally, when discussing the timing of unit closures, Citi said, "what feels like a 'surprise' here is likely going to linger in investor sentiment." As a result, Citi lowered its target price for Domino's from $530 to $450 and maintained a neutral rating for the Company.

209. Similarly, in its July 18, 2024, analyst report, Cowen emphasized in the report's title that "Reduced Int'l Store Growth Outlook Steals the Show." The report explained that "Domino's is temporarily withdrawing guidance for 1,100+ net restaurant openings based on challenges at Domino's Pizza Enterprises (ASX.DMP; not covered), Domino's largest international master franchisee, that are most acute in Japan & France." As a result, Cowen said it was "look[ing] for more clarity on [Domino's] conference call to learn if 1,100+ net restaurant openings can resume by 2027."

210. On the same day, Barclays published a report titled "2024 Outlook Tempered on US Comp & Int'l Unit Growth." The report stated, "long-term global unit growth targets will not be achieved in '24 (& '25 at risk) with outsized closures expected by their master franchisee DPE (led by France & Japan). These factors will lead to a reduction in top & therefore bottom line estimates." As a result, Barclays "struggle[d] with the return to Domino's historical premium valuation relative to our large cap, multi-national, franchised QSR peers," and stated, "with today's update specific to . . . a shortfall on Int'l unit growth, we believe the valuation gap should narrow further."

211. Additionally, in its July 18, 2024 analyst report, UBS expected Domino's "shares will be under pressure today given . . . Int'l unit growth guidance for '24 is now for net opens to fall 175-275 below the 925+ store target, w/ guidance

for 1,100+ net stores globally suspended until DPE's open/closure challenges are known." It added, while discussing international store growth, "the suspension of the global target generally wasn't" anticipated and "any add'l insights into considerations for future yrs will be a focus." *See also supra* ¶ 137 (Goldman Sachs stating it was "surprised by the large international unit growth guidance cuts").

212. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Domino's securities, Plaintiff and other Class members have suffered significant losses and damages.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

213. Defendants Weiner and Jordan had a financial motive to commit fraud. They sold significant portions of their holdings of Domino's securities during the Class Period at artificially inflated prices, before the truth was revealed on July 18, 2024, for net profits of over $11.16 million.

214. Weiner sold approximately $12.8 million worth of Domino's stock in open market sales for $10.3 million in net profit. Jordan sold $1.17 million worth of stock in open market sales for a net profit of $861,378. Their stock sales were suspicious by every measure, including based on their timing to capitalize on the inflated price of Domino's stock before the truth was revealed, how these sales stand out as compared to Weiner and Jordan's lack of open-market sales before the Class Period and their lack of open-market purchases during the Class Period, the portion

of their total holdings of Domino's stock that these sales represented, and the increased profit that they made by selling their shares at elevated prices above the price of Domino's stock after the truth was revealed. *See supra* ¶¶ 144-56.

215. Each of the Individual Defendants also had scienter as to the false and misleading nature of their statements because they each knew or, at a minimum, recklessly disregarded the facts described in the Substantive Allegations section above.

216. The Individual Defendants' scienter is particularly established by the fact that they admitted to communicating with DPE regularly, including as a basis for the global net store growth guidance that Domino's gave throughout the Class Period, and were therefore knowledgeable about the current state of DPE's business at all relevant times. *See supra* ¶¶ 139-43.

217. The Individual Defendants' scienter is further established by the testimony of Confidential Witnesses who described the problems with DPE's business model, which the Individual Defendants were aware of based on their communications with DPE and the importance of DPE to the Company's business. *See supra* ¶¶ 119-28.

218. For example, CW 2 explained that Samantha Thorburn, DPE's Head of Property who reported to its CEO (Meij) and was in the inner circle of DPE's senior management, knew about the problems with DPE's operations. *See supra* ¶ 128.

219. In addition, DPE'S longtime CEO was "sacked" as a result of these problems. *See supra* ¶ 126.

220. The Individual Defendants' scienter is further established by their making detailed statements about the topics at issue, including in response to analyst requestions, that repeatedly expressed confidence in the Company's global net store growth guidance and reassured investors that DPE's problems were "idiosyncratic," "onetime," and "transitory" events that were in the past or "behind us." *See, e.g., supra* ¶¶ 77-80, 82-83, 91-92, 162-63, 173, 176-77, 179. Choosing to make such detailed statements specifically aimed at allaying investors' concerns about these topics demonstrates the Individual Defendants' scienter as to the underlying factual information related to these issues.

221. The Individual Defendants' scienter is further established by the admissions that they and DPE made after the Class Period about the source of DPE's problems during the Class Period. *See supra* ¶¶ 129-30, 140-42.

222. Defendants Weiner and Reddy's actual knowledge of the falsity of the alleged misstatements and omissions is further established by their signing of the SOX certifications that certified that the Company's SEC filings were accurate. Before vouching for the accuracy of the statements made in Domino's SEC filings, the certifying Defendants were obligated to familiarize themselves with the contents of the filings and the underlying operations described therein. *See supra* ¶¶ 181, 189.

223. The Individual Defendants' scienter is also established because the alleged misstatements and omissions here concerned the core operations of Domino's. DPE was the Company's largest franchisee, including being its largest master franchisee since at least 2014, operating 3,840 stores in 12 international markets as of the end of 2023, which accounted for approximately 28% of the Company's international store count and 19% of its global store count. DPE was also the master franchisee that was expected to open the most stores going forward. *See supra* ¶¶ 51-55. The Individual Defendants, by virtue of their roles in senior management and involvement in Domino's core operations, would have had knowledge of the true nature of the Company's core businesses during the Class Period. In addition, the Individual Defendants had access to reports and communications describing these operations.

224. Domino's itself had scienter as to the false and misleading nature of the statements described above based on the scienter of the Individual Defendants. In addition, the Company's scienter can be inferred because its statements about such crucial issues would have been approved by other corporate officials that knew they were false or misleading.

## VIII. NO SAFE HARBOR

225. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements

pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

226. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer or top management of Domino's who knew that the statements were false when made, and/or the forward-looking statement was not accompanied by meaningful cautionary language.

## IX. CLASS ACTION ALLEGATIONS

227. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Domino's securities during the Class Period of

December 7, 2023 to July 17, 2024, both dates inclusive (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

228. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Domino's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Domino's or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

229. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

230. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and

securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

231. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Domino's;
- whether the Individual Defendants caused Domino's to issue false and misleading statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the prices of Domino's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

232. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS

233. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Domino's securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE and was covered by multiple analysts during the Class Period;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased, acquired and/or sold Domino's securities between the time the Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

234. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

235. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens*

*of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed herein.

## XI. CAUSES OF ACTION

### COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants)

236. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

237. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

238. Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails, and/or the facilities of national securities exchanges, violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by the SEC.

239. Defendants made false and misleading statements of material facts, omitted to state material facts which they had a duty to disclose and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

240. These Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiff and the Class; and (ii) cause Plaintiff and the Class to purchase or acquire Domino's securities.

241. Defendants also were individually and collectively responsible for making the false and misleading statements and omissions alleged herein by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's financial condition.

242. Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the other members of the Class who purchased or acquired Domino's securities. By virtue of their actions, positions, and associations with Domino's, these Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, these Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose

such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

243. During the Class Period, Domino's securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying upon the price of the Domino's securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, purchased or acquired Domino's securities at artificially inflated prices and were damaged thereby. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or acquired said securities at those prices.

244. By purchasing or acquiring their Domino's securities at these artificially inflated prices, Plaintiff and the Class members suffered economic losses, which losses were a direct and proximate result of Defendant Domino's and the Individual Defendants' fraudulent conduct.

245. By virtue of the foregoing, Defendants are liable to Plaintiff and members of the proposed Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

## (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

246. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

247. During the Class Period, the Individual Defendants participated in the operation and management of Domino's, and conducted and participated, directly and indirectly, in the conduct of Domino's business affairs. Because of their senior positions, they knew the adverse non-public information about Domino's misstatement of income and expenses and false financial statements.

248. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Domino's financial condition and results of operations, and to correct promptly any public statements issued by Domino's which had become materially false or misleading.

249. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Domino's disseminated in the marketplace during the Class Period concerning Domino's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Domino's to engage in the wrongful acts complained of herein.

The Individual Defendants, therefore, were "controlling persons" of Domino's within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Domino's securities.

250. Each of the Individual Defendants, therefore, acted as a controlling person of Domino's. By reason of their senior management positions and/or being directors of Domino's, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Domino's to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Domino's and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

251. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Domino's.

## XII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

252. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

253. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

254. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

255. Awarding such other and further relief as this Court may deem just and proper.

## XIII. DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 11, 2025

Respectfully submitted,

**POMERANTZ LLP**

*/s/Jeremy A Lieberman*

Jeremy A. Lieberman
Michael Grunfeld
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
mgrunfeld@pomlaw.com

*Lead Counsel for Lead Plaintiff State of Rhode Island Office of the General Treasurer, on behalf of the Employees' Retirement System of the State of Rhode Island and for the Class*

**ASHERKELLY**
Matthew Henzi
Cynthia Billings-Dunn
25800 Northwestern Highway, Suite 1100
Southfield, Michigan 48075
Telephone: (248) 746-2710
mhenzi@asherkellylaw.com
cbdunn@asherkellylaw.com

*Counsel for Lead Plaintiff State of Rhode Island Office of the General Treasurer, on behalf of the Employees' Retirement System of the State of Rhode Island and Liaison Counsel for the Class*